Sooeield, J.,
delivered the opinion of the court:
By authority of an act of Congress approved June 18,1878, a survey of Pearl River, in Mississippi, with a view to improve its navigation, was made under the direction of the War Department. The survey extended from Carthage, which is 105 miles above the city of Jackson, to the mouth of the river, a distance of about 500 miles. A chart was prepared, on which were noted the obstructions to navigation found in the river at that time.
In 1879 and again in 1880 small appropriations were made for the improvement above Jackson, and the work was commenced and prosecuted on that part of the river lor several years'.
June 14, 1880, Congress appropriated $30,000 to commence the improvement below Jackson.
The Department advertised for proposals. The claimant became the lowest bidder, and the work, beginning at Jackson and extending down the river 195 miles, was allotted to him.
*53 October 7,1880, a formal contract was executed, in which, this claimant agreed—
“ In accordance with advertisement and specifications, and in accordance with his proposal, to faithfully perform the work of improving the navigation of Pearl River for a continuous distance of 195 miles to a point about three-quarters of a mile below Harrison’s Ferry, as exhibited on a chart on file in the United States engineer office at New Orleans.”
The contract provided that the work should be completed by January 1, 1882, but the time was afterwards extended to January 1, 1883. The work was not to be accepted until it had undergone a rigid inspection by % Government officer.
The claimant was furnished with a copy of the chart referred to in the contract and advertisement, and soon after began the improvement.
In the autumn of 1881 the claimant notified the engineer that he had cleared the river for 104 miles, and requested an inspection. The request was refused.
In September, 1882, he notified that officer that, his work was complete for the whole 195 miles, and requested an inspection. To this request the engineer replied that Mr. Collins,, the assistant engineer who had made the original survey, had already passed down the river and found many obstructions, and therefore a more formal inspection at that time would be useless, as he would not accept the work in that condition. The claimant contended that the obstructions observed by Mr. Collins had come into the stream after he had once cleared it out and that he was not required by his contract to remove new obstructions which were being deposited by every flood. Nevertheless, he obtained Mr. Collins’s notes, went over his work again, and removed all the instructions so noted.
December 12, 1882, he again notified the engineer that he had completed his contract and requested inspection and payment. December 25, 1882, Assistant Engineer Buchanan was sent to make the inspection, but he found the river too high.
Thereupon a.supplementary contract was made, whereby it was agreed that $25,000 should be then paid and the balance left until after an inspection could be made the next summer.
Although no official inspection was then made, the court has found that the claimant had, in fact, prior to December 12, *54 1882, removed all the obstructions to navigation in the river which were noted in the chart of the original survey; all that he had found in the river as he progressed with the work, whether noted on the chart or not, and all that were pointed out on the notes of Mr. Collins furnished him in September, 1882.
In August, 1883, Mr. Buchanan made an inspection of the work and reported to the engineer in charge September 11, 1883. The latter officer, in reply to the claimant’s inquiry as to the result of the inspection, informed him that Mr. Buchanan had reported that “ he did not believe that the river had been cleaned out according to contract,” and that “he (the engineer in charge) could not accept the work.” He did not inform him • of any specific obstructions found in the river by Mr. Buchanan, nor of any further work which he was expected to perform.
If the question of performance or non-performance were in issue here the court would be compelled to decide that on December 12,1882, when the claimant called for final inspection, his work was complete, and only awaited a formal inspection and acceptance to entitle him to his pay; and further, that he was not bound by the terms of his contract to clear the river of obstructions deposited by the floods of 1883.
The claimant, however, had agreed to submit that question to the decision of the defendants or their engineer in charge. The advertisement provides that—
“ No payment will be made until the work contracted for is completed to the satisfaction of the United States.”
The specifications further provide that—
“When the contractor reports his work finished an inspection will be made to satisfy the United States before settlement.”
The contract itself provides that—
“ The decision of the engineer officer in charge as to conformity [of the work to the contract] shall be final.”
The supplemental contract again provides that the claimant shall—
“ Make no claim or demand for said balance until after such inspection and acceptance.”
The engineer decided against the claimant, and that decision must stand unless impeached for fraud or mistake other than an error of judgment.
*55 If that were all, the claimant would be without remedy in this court. But it is not all. After an unfavorable inspection and non-acceptance the claimant was to be informed of the alleged defects in his work and given an opportunity to perfect it.
The original contract provides that—
“ All work done under this contract shall, before being accepted, be subject to rigid inspection by an inspector appointed on the part of the Government, and such as does not conform to the specifications set forth in this contract shall be made to conform before settlement of the contract.”
The supplemental contract further provides that the claimant shall—
“ Make no claim or demand for said balance until after such inspection and acceptance and to duly perform any and all such other or further work as may, under the terms and conditions of said original contract, be required of him by the inspecting officer, and to leave all his plant on the work until after final and accepted completion of said work by the United States.”
The purpose in retaining the $3,736 and requiring the plant to be left on the work was, undoubtedly, to secure the performance of further work, if, on inspection, any deficiency should be found.
The claimant was never thereafter notified of any specific deficiency nor required to perform any specific work.
It is true that after the final inspection in August, 1883, the claimant was informed by the engineer in charge under date of September 11, 1883, that the inspector had reported that “he (the inspector) did not believe that the river had been cleaned out according to contract,” and that he (the engineer) “ could not accept the work.” This certainly was not such a notice as the claimant had a right to expect.
January 12, 1884, the claimant addressed a letter to the engineer in charge,complaining that he had heard nothing from him since his notice' of non acceptance September 11, 1883, and that “neither he nor the inspecting officer had required of him to do further work,” while “ his plant had been idle for more than a year, at an expense of fully $1,000, to say nothing of its depreciation and loss of its use;” and he added that—
“Not having been required to do more work, or any instructions to that effect * * * I consider my contract at an end.”
*56 To this complaint the engineer replied, January 25, 1884, as follows:
“ I awaited from September 11th, to hear from you on the subject, and am surprised that you should have allowed the low-water season to pass before making any move in the matter, if you had any intention of doing any more work. I notified you that I could not accept the work, and the contract states what worlc is required. It is very evident that you and your employés do not construe the contract as I and my assistants do. There is nothing left, therefore, but to have the Department pass upon it, and I shall await instructions from the Chief of Engineers.”
These two notices (September 11 and January 25) were altogether too indefinite. The claimant might have passed over the whole 195 miles without discovering the particular omissions upon which the inspector had based his opinion. They were equivalent to saying to the claimant, “ There are some obstructions still in the river; hunt out and remove them at your peril.”
Notwithstanding the claimant, in his letter of January 12, 1884, informed the engineer that in consequence of the long delay in notifying him of further work required he “ considered his contract at an end,” still, after learning from that officer that his case was to be passed upon by the Department, he kept his plant tied up on the river for more than sixteen months longer, apparently awaiting orders for further work.
This was equivalent to a tender of readiness on his part to perform any further work that might be required to fulfill his contract to the satisfaction of the United States.” He was only bound to keep up this preparation for a reasonable time. Cooper’s Case (8 C. Cls. R., 199.)
After the long delay without any specific requirement for further work, the presumption would arise that the Government had become satisfied with the work, and then the claimant might rightfully remove his plant and demand his pay. The judgment of the court is that the claimant recover $3,736.