Graham, Judge,
delivered the opinion of the court.
The facts in this case do not require any full or detailed discussion. They are fully set forth in the findings.
The plaintiff entered into a formal written contract to manufacture 800,000 3-inch projectiles according to the terms and conditions of the contract and specifications, which contract and specifications the plaintiff has attached to its petition and made part thereof. Prior to the time the contract was entered into two methods were being used for preparing the cavities of these projectiles. Aside from the production in some Government operated shops, the extent of which production is not indicated, where the forge finishing process of making the cavity was being used, all *209 independent contractors with the Government manufacturing shells were using the machine finishing process. In the machine finishing process the original cavity was made smaller than the required size and afterwards reamed out by machinery. By the forged finishing process the cavity at the time of the forging was made larger and practically of the size required for use, the cavity being treated after-wards.
Before deciding which process it would use, the plaintiff’s representative visited the plant of the American Steel & Foundry Company, another contractor, which at the time was manufacturing shells by the machine finishing process, and discussed the methods with the representative of that company, and was informed of the fact that it had previously tried to produce shells by the forged finished process and that it had proven unsatisfactory and had been abandoned and the machine finishing process adopted, the forge finishing process not having produced satisfactory results. With this knowledge the plaintiff decided, apparently, to take its chance and use the forge finishing process, it being the cheaper and easier method of manufacture. Under the specifications it was permissible for the contractor to use this method of production as it saw fit. The method was not dictated by the Government. What the Government required was results and the production of shells of the kind and character called for by the specifications. It was for the plaintiff to meet these requirements of the specifications by such instrumentalities and methods as it saw fit. It knew from the terms of its contract that it was required to produce shells which would pass inspection and satisfy the judgment and decision of the Government’s inspector as to whether they met the requirements of the contract. It knew that it was not to be its view of the character of the shells produced and their conformity to the requirements of the specifications that was to decide the matter, but the judgment of the inspector. Had this plaintiff used the machine finishing process as the American Steel & Foundry Company was using it, it seems reasonably certain that this suit would hot be here. In signing *210 this contract the plaintiff knowingly put itself completely in the hands of the Government, and while the provisions of the contract may seem to be hard and one-sided, as far as the plaintiff is concerned, it is not for the court to make a different contract for it. The contract must be enforced according to its terms as the court finds it. Carnegie Steel Co. v. United States, 240 U. S. 156 , Day v. United States, 245 U. S. 159.
About a month after the plaintiff began production the shells being produced were rejected by the inspector as not satisfactory. This rejection was made after the inspector had consulted his superior officer. The plaintiff continued to produce shells of the kind rejected in the face of the decision of the inspector and was then ordered to suspend operations by notice promptly given, as provided in the contract. The power to suspend was given by the contract. A few days later the Chief of the Bureau of Ordnance, who .had immediate charge of the work at this plant, visited the plant and approved of the action of the inspector and his superior, both as to the rejection of shells and suspension of operations.
It seems desirable first to briefly consider certain provisions of the contract and specifications. The contract required the plaintiff to produce and deliver projectiles possessing certain required qualities as to material, structure, and finish, both exterior and interior. The specifications for 3-inch projectiles were as follows:
“ Three-inch projectiles are to have a smooth machined finish on the exterior, but the cavity may have a forged finish if the finish is fairly smooth and free from tears and ridges.”
That is to say, the exterior should be machine .finished but the cavity might be forged finished if the plaintiff decided to use that process. But whatever the process used the finish of 'the cavity must be—
1. Fairly smooth.
2. Free from tears and ridges.
The word “ tears ” as used here seems apparently to mean openings or cracks in the surface, and “ ridges ” to mean protuberances or excrescences which tended to make the surface *211 uneven or rough, the two together meaning a roughness or lack of smoothness due to their existence. In any event, whatever meaning may be given to the words, whether the shells contained tears and ridges, either or both, or whether the “ finish ”. was “ fairly smooth,” within the meaning of the specifications, was clearly a matter of opinion and judgment derived largely from a sense either of sight or touch, or both, and a certain knowledge of the character of finish that was needed in order that the shell might effectively accomplish its purpose. It was clearly not a question that could be precisely and definitely determined as in the case of the length of the shell which could be ascertained by measurement. It was a matter about which it was possible for two capable and experienced and honest experts to entertain different opinions. The Government was at war and shells were urgently needed to carry it forward. Apparently to meet these needs and anticipating that there might arise a difference of opinion between the plaintiff and the Government as to whether the shells produced and offered for acceptance were of the kind desired and met the requirements of the specifications, the contract provided for the determination of this question fully and finally by the Government requiring that the shells must satisfy the judgment of the Government’s inspector who had the light to reject them and to suspend their manufacture in case the shells offered were not satisfactory and did not in his opinion meet the requirements of the specifications in every particular, including the question as to whether the “ finish ” of the cavities was “ fairly smooth ” or free from “ tears and ridges.”
It may be well here to briefly refer to other requirements of the contract and specifications which show the full control given the Government over the operations under this contract.
1. Section 6 of the contract provides that if there was any doubt about the meaning of the - specifications or any obscurity in the wording of them, they would be explained and all the necessary explanations and directions to make them definite and certain would be given by the Bureau of Ordnance, and that such directions and explanations would be binding on the plaintiff as though they had been originally contained in the specifications and drawings-
*212 2. In section 8 of the specifications it was provided that projectiles should be submitted within a certain time to make experimental tests and that if these projectiles were not supplied within the time stipulated, or for any other reason the bureau was satisfied that the plaintiff was unable to deliver projectiles of the quality required and within the time specified, the contract could be cancelled.
3. Section 8 of the contract provided that it might be declared to be forfeited at the option of the defendant “ if at any time prior to its final completion it is found that he is unable to proceed with and make satisfactory progress in the manufacture and delivery of projectiles.”
4. That the provisions of the contract and the drawings and specifications might be changed by the party of the second part and the cost of such change, if more than $500 is left on appeal to the decision of the Secretary of the Navy, whose decision should be final.
5. That if any doubts or disputes arise as to the meaning of anything in the drawings or the specifications the matter should at once be referred to the Chief of the Bureau of Ordnance for determination, and in case the plaintiff was not satisfied with the decision of the bureau an appeal would lie to the Secretary of the Navy whose decision was made final.
6. It was also stated that time was an essential feature of the contract. There was also a provision for liquidated damages in case of delay.
Returning to the matter of the provisions of the contract as to the acceptance or rejection of the projectiles, the contract provides that there was an “ obligation ” upon the plaintiff to—
(a) “ Satisfy the inspector as to the correctness of everything and its accordance with the terms of the contract and these specifications. Projectiles may be rejected at any time in the course of manufacture for defects developed or discovered.”
(5) Projectiles shall be made of good quality of steel, and must be sound and free from cracks and blowholes and all other defects seriously affecting their resistance and value, this condition to be determined by the Government inspector.
*213 {(;) The contractor must satisfy the inspector that the material is of uniform and good quality, that the bands are properly annealed before banding,, and that the bands are properly fitted, provided that the inspector, “ at his discretion,” may have the bands removed and satisfy himself that the work has been properly performed.
Driscoll v. United States, 34 C. Cls. 508, 523; Kihlberg v. United States, 97 U. S. 398; Gleason & Gosnell v. United States, 33 C. Cls. 65; Kimball case, 24 C. Cls. 35; Kennedy case, 24 C. Cls. 122.
As heretofore stated, after the rejection of shells and suspension of the operations the Chief of the Bureau of Ordnance visited the plant and approved of the action of the inspector and his superior in both particulars. He selected a shell from a number of shells the interior of which had the required finish as to smoothness and states that shells possessing a similar degree of smoothness would be accepted. It happened that the interior of this shell had been sand blasted so as to make it smooth. He, however, did not suggest or require that the sand-blasting process or any other process should be used. He merely stated that the interior finish of this shell met the requirements of the specifications. .There was no demand made that the plaintiff should change his method of producing shells, but he was given to understand that he must produce shells the finish of which must possess a smoothness of cavity which was satisfactory. The plaintiff made some protests to the bureau and complained about the rejection of shells, asserting that they should be accepted, and then proceeded of its own volition to install machinery for sand blasting, which, hoAvever, failed to produce satisfactory results, and the shells thus offered were not accepted but were rejected. After further complaint and protests to the inspector and the bureau about the rejection and claims that the shells should be accepted the plaintiff, without any compulsion from the Government or any requirements or suggestion by the latter to that effect and without any change in the specifications, after apparently becoming satisfied that it could not produce the desired result and a shell that would be satisfactory to the Government by the sand-blasting method," proceeded to alter its *214 plant and install machinery for machining the cavities of forged finished shells which it had on hand and for which it had contracted. The method adopted was to take the forged finished shell, which, as heretofore explained, had a larger cavity at the time it was forged than a shell for machine finishing, and was not forged primarily for machining, in which case the cavity of the forging was made smaller, and ream it out by machine. In thus attempting to machine finish forged finished shells it so thinned the wall of the shell that it would not meet the ballistic tests as to fragmentation.
By reason of the change in its plant in installing the machining process the plaintiff did not begin to deliver shells until the latter part of January, 1918, and from that time until about June 6, 1918, it was experiencing difficulties in producing satisfactory shells, owing, as stated, to the failure of those produced, by its machining process to meet the tests. Up to this time the plaintiff had delivered approximately 40,000 shells, of which about 12,000 had. met the requirements of the contract, the balance having been accepted as target shells, apparently in an effort by the Government’s representatives to relieve the plaintiff in its failure to meet the requirements of the contract.
By said June 6,1918, it became apparent, as it had been for some time, that the plaintiff was not meeting, and could not meet the requirements of its contract and that it was unable to deliver projectiles of the quality required and within the time specified. Under these conditions section 8 of the specifications permitted the defendant to cancel the contract, or under section 8 of the contract to forfeit it, at its option. The Government’s representatives, however, desiring in a spirit of liberality to remove some of the difficulties the plaintiff was encountering in fulfilling its contract, agreed with it to relieve it of some of the requirements of the specifications and to permit it to produce and furnish target shells instead of common shells, the Government to pay as much for the target shells as it agreed to pay under the contract for the common shells called for by the specifications; and on June 6,1918, the parties entered into a supplemental agreement covering this understanding, and thus relieved *215 the plaintiff of the requirements of the contract which were causing it trouble. By this supplemental contract the plaintiff was relieved of the work of machining, cleaning, inspecting, and spraying the cavities of shells without any corresponding reduction in the price paid. The contract not only met with the approval of the plaintiff but with its expressed gratification and thanks. It was very liberal treatment on the part of the Government.
The plaintiff then began to deliver shells for target use and up to August 29, 1918, had delivered approximately 70,000 additional shells, a total delivered up to that time of 110,000, when its contract — even allowing two months for delay at the outset in receiving steel — called for the completion and delivery of 300,000 shells by that date. About this time it developed that the Bridgeport Projectile Company, with which the plaintiff had a contract to supply it with forgings required for its contract, could not supply one-third of .the quantity needed. It seems that this latter company had passed into other hands, and it appears finally came under the control of the War Department, which required its full capacity for the production of shells for the Army. In ■ any event, the plaintiff, becoming satisfied that, it could not secure the necessary forgings, of its own accord communicated with the Government and suggested, on August 29, 1918, that it would be to the mutual advantage of both parties to cancel the contract as to one-third of the-quantity of shells called for, with the right in the plaintiff to prepare and deliver the other two-thirds or so much thereof as the forgings which it had on hand would produce. Thereupon the Government canceled the contract and notified the plaintiff to this effect and agreed to take over at cost, price to the plaintiff all unused materials for the production of shells which the plaintiff had on hand. These materials-were eventually taken over by the Government and the value of the same at said cost price amounted to $92,346.74, about which there is no dispute.
The plaintiff is apparently suing here, as well as can be determined from the general averments in its petition, to recover damages growing out of certain alleged breaches of contract.
*216 First. For the alleged wrongful refusal to accept and the rejection of shells by the inspector in October and November, 1917.
Second. The alleged action of the Government’s representatives in requiring it to change from forge finishing the cavity to a machine finishing process of the same.
Third. Canceling the contract.
As heretofore pointed out and discussed, the plaintiff was under an “obligation” to satisfy the inspectors that these shells were of the character required by the contract and specifications. The decision of this matter was left by the contract entirely with the inspectors. Their decision was binding upon the plaintiff. Therefore no breach of the contract occurred when the inspectors rejected and refused to accept the shells.
As to the second claim of a breach by reason of being required to change the process from forge finishing to machine finishing, it would be sufficient to say that the court has found as a fact that the plaintiff was not requested to make this change, but made it of its own accord and voluntarily. However, the claim in this case would seem to be based upon a suggestion that there had been a change in the specifications. The findings show that there had been no change in the specifications, that the defendant did not indicate or dictate the process by which the shells should be produced, and even had it made a change under the contract it had that right, with the right of appeal by the plaintiff finally to the Secretary of the Navy whose decision would be final. While some protests were made to the inspector and the bureau, no appeal to the Secretary of the Navy was taken in this case on the question of a change from forge finishing to machine finishing. The Secretary of the Navy was the only forum for relief on the question of change in the specifications provided for in the contract unless it should be shown that the decision was the result of fraud or such gross error as amounted to fraud. This latter question is not in the case, as the Secretary was not appealed to.
The contract also provided that where any doubt arose as to the meaning of the specifications or obscurity in the word *217 ing of them, the representatives of the Government would explain them and give such directions as to make them definite and certain if requested to do so, and that such directions and explanations would be binding on the plaintiff as though they had been part of the original specifications and drawings. Further, that if any doubts or disputes arose as to the meaning of the drawings or specifications the plaintiff could refer the matter to the Chief of the Bureau of Ordnance for determination, and if not satisfied with his determination could appeal to the Secretary of the Navy, whose decision should be final. There was no appeal to the Secretary of the Navy.
It follows that as the second part of the plaintiff’s claim for damages is based upon a breach of the contract out of which grew losses by reason of delay and expense in changing from the forge finishing to the machine finishing process, damages can not be recovered.
As to the third ground of recovery for breach by reason of the cancellation of the contract, it would be sufficient to state that the court finds as a fact that this was done at the suggestion of the plaintiff. Furthermore, that this suggestion arose out of the fact that the plaintiff was in a position where it could not deliver about one-third of the shells contracted for by reason of its inability to get the necessary forgings. However, the Government under section 8 of the specifications had a right to cancel the contract if for any reason it was satisfied that the plaintiff was unable to deliver projectiles of the quality required and within the time specified. At the time of this suggestion by the plaintiff for concellation the plaintiff had delivered approximately 110,000 of the 300,000 shells called for by the contract, and the time of delivery had about expired. Further, under section 8 of the contract it is provided that if it is found that the plaintiff “ is unable or fails to proceed with and make satisfactory progress in the manufacture and delivery of said projectiles,” the defendant could at its “ option” declare the contract forfeited. Had there been no provision for cancellation and forfeiture, this being a naval contract the Government had the right to cancel conferred by the statute of June 15, 1917. Meyer Scale & Hardware *218 Co. v. United States, ante, p. 26. So that, for whatever ground or for whatever reason the Government canceled the contract it was within its rights in doing so, even had there been no suggestion by the plaintiff for such action as being to the mutual benefit of both parties, and no acknowledgment by the plaintiff of its inability to secure materials with which to fulfill its contract. The lawfulness of the cancellation being established, it follows that there could have been no breach and, consequently, no recovery of unearned profits as a part of the damages growing out of the alleged breach.
There is another feature of this case which it may be well to notice, and that is the effect of the supplemental contract entered into between the parties on June 6, 1918, and attached to the findings. It is to be recalled that at that time the plaintiff had only delivered 40,000 of the shells, of which only 12,000 were of the kind called for by the contract and which met the requirements of the specifications to the satisfaction of the Government. The balance were accepted by the Government for target purposes, as they failed to meet the requirements of the contract and specifications. Seeing that the plaintiff was in difficulties and could not carry out its contract within the time prescribed and because it could not produce the character of shell called for, the Government, with the approval and expressed appreciation of the plaintiff, changed the contract so as to relieve the plaintiff of the requirements of the contract as to the finish of the cavity of the shells, with which it seemed unable to comply, and agreed to accept and allow it' to deliver the balance of the shells called for by the contract, to be used for target practice, and pay it the full contract price for the same which, it had been agreed should be paid for properly finished cavities — that is, for common shells.
The plaintiff accepted the change with expressions of thanks and made and asserted at the time no claim for damages for loss by reason of alleged delay caused by the Government, or additional expenditures connected with the change of process from forge finishing to machine finishing. *219 At this very time under the provisions of the contract, as heretofore pointed out, the Government could have canceled the contract or forfeited it at the expense of the plaintiff without a right to recover for any losses by reason of defaults. The supplemental contract was, in effect, a new contract and eliminated all claims for damages and defaults connected with the old contract. With the plaintiff’s own consent the parties were placed upon a new basis and the plaintiff consented to do its work under a different contract. It was estopped by its action in entering into the supplemental contract from claiming damage growing out of the alleged defaults of the defendant under the old contract. The requirements of the contract out of which it alleged these defaults arose were done away with and new requirements substituted in their place, which were very much less burdensome and less expensive to the plaintiff without any proportional diminution of compensation. It proceeded to perform its work under the new supplemental contract and received payments for its work done thereunder. It made no claim at the time of entering into the supplemental contract; in fact, suggested no claim for damages growing out of previous defaults upon the part of the defendant.
After the cancellation of the contract the Government voluntarily granted an extension of five months’ time for completion. It claimed the sum of $23,905.24 for liquidated damages for other delays than those covered by the five months’ extension. It afterwards in an effort to terminate the transaction and close it by final settlement offered to waive this claim and settle with the plaintiff upon the basis of $12,064.24, as shown in the findings. The plaintiff refused this offer. It seems to have been the Government’s view of a fair and just settlement, and it would seem therefore that the plaintiff should be allowed recovery for this amount, inasmuch as the court finds that there is no evidence in the record to establish this claim for liquidated damages.
Judgment should be entered in favor of the plaintiff in the amount of $12,064.24. And it is so ordered.
Hat, Judge; Downey, Judge; Booth, Judge, and Campbell, Chief Justice, concur: