UNITED STATES of America and the
United States Department of
Justice, Appellants,

v.

INSLAW, INC., Appellee.

In re INSLAW, INC., Debtor.

INSLAW, INC., Plaintiff,

v.

UNITED STATES of America, and the
United States Department of
Justice, Defendants.

Civ. A. Nos. 88–0528–WBB and
88–0696–WBB to
88–0698–WBB.
Bankruptcy No. 85–0070.
Adv. No. 86–0069.

United States District Court,
District of Columbia.

Nov. 22, 1989.

. J. Christopher Kohn, Sandra P. Spooner, Dean S. Cooper, Allen L. Lear, Dept. of Justice, Commercial Litigation Branch, Civ. Div., Washington, D.C., for U.S.

Charles R. Work, McDermott, Will & Emery, Michael E. Friedlander, Counts & Kanne, Chartered, Washington, D.C., for Inslaw, Inc.

## MEMORANDUM

BRYANT, Senior District Judge.

This matter, before the court pursuant to 28 U.S.C. § 158(a), amounts to a consolidated appeal of the final judgments entered by the United States Bankruptcy Court against the United States of America and the Department of Justice ("DOJ") in favor of INSLAW, Inc.

### BACKGROUND

The relationship between the parties dates far prior to INSLAW, Inc. becoming a bankrupt, and certain uncontroverted aspects of that relationship are set forth as briefly as possible as necessary background for understanding how the case develops to its present posture.

In 1973, William Hamilton and Dean Merill formed the Institute for Law and Social Research, a non-profit corporation organized to develop computer software designed to automate the record-keeping and case monitoring activities of law enforcement offices. Under contract to the Law Enforcement Assistance Administration (LEAA), INSLAW developed the Prosecutor's Management Information System ("PROMIS"). The parties do not dispute that this software which the bankruptcy court refers to as "old PROMIS" was developed with public grant money and was in the public domain.

In 1980, the Institute learned that LEAA funding which was the Institute's primary and almost sole source of income would dry up. The Institute then took steps to form

a for-profit corporation, INSLAW, Inc., which would continue to market and enhance PROMIS as well as develop new proprietary computer software products. When the Institute on Law and Social Policy transformed itself into INSLAW, the Justice Department had several outstanding contracts with Inslaw. The first contract had been entered into in 1979 by the LEAA. This contract called for a three-year effort to maintain and upgrade PROMIS. However, by 1981, the LEAA ceased to exist and the Justice Department transferred the contract to its Bureau of Justice Statistics (BJS). But, BJS lacked the funding necessary to carry out the third and final year of the contract. Consequently, the Executive Office of the United States Attorneys (EOUSA) allocated approximately $500,000 to pay for the last year of the contract. In return for this funding, INSLAW agreed to make five specific enhancements to PROMIS. These enhancements later became known as the "BJS enhancements".

The Institute also entered into a second contract with the Justice Department in 1979. In this contract, the EOUSA paid for a pilot/feasibility study to determine whether PROMIS could be successfully installed in two large U.S. Attorneys' Offices in California and New Jersey. In addition, the contract directed the Institute to develop a word processing version of PROMIS which would then be introduced into two smaller offices in Vermont and West Virginia.

In late 1981, DOJ decided to go forward and implement the software used in the pilot project in the U.S. Attorneys' Offices, and on November 2, 1981 issued a Request for Proposals ("RFP") seeking bids on a contract to "develop and implement" a litigation management system in 89 U.S. Attorneys' Offices in the continental U.S. and U.S. Territories. More specifically, the contract sought proposals for (1) implementing the computerized "pilot version" of PROMIS as supplemented by the BJS enhancements in 20 "large" U.S. Attorneys' Offices; (2) creating and implementing a non-computerized version of that software for word processors in the remaining U.S. Attorneys' Offices; and (3) providing necessary training, maintenance and support for three years.

The RFP included a lengthy Statement of Work containing 60 paragraphs, one of which (3.2.4.2) stated:

All systems enhancements, modifications, and development performed pursuant to this contract shall be incorporated within the systems which have already been installed in the U.S. Attorneys' Offices, including systems installed pursuant to other contracts in the District of Columbia, the District of New Jersey, the District of Vermont, the Southern District of California, and the Southern District of West Virginia.

INSLAW responded to the RFP on December 2, 1981, and in reference to the "enhancements" mentioned in the above paragraph it stated:

During the life of this project—but not as a part of this project—INSLAW plans new enhancements and modifications to the basic PROMIS software and to the original version of PROMIS for U.S. Attorneys.

The parties negotiated for over two months, and finally entered into a contract on March 16, 1982. Prior to the execution of the contract, and for a time thereafter, there were extensive discussions about what INSLAW claimed were privately funded enhancements which were featured in PROMIS. In other words, INSLAW claimed that at the time of entering into the contract their version of PROMIS was considerably more advanced than it was at the time of the pilot project, and that it claimed proprietary rights to those features which were developed with other than government funding.

In late May of 1982 James Rogers, an attorney representing Inslaw during a part of the negotiations, wrote to Stanley Morris, an Associate Deputy Attorney General, as follows:

[Y]ou expressed concern about the software itself, PROMIS 82, which Inslaw proposes to license to users for a fee commencing in June of 1982. We are

prepared to make the following representations, which I think should alleviate the Department's concerns:

PROMIS 82 is the sum of only three parts:

(1) the "Original PROMIS," that is, the public domain software as of May 15, 1981 as memorialized in tapes delivered to the Bureau of Justice Statistics;

(2) enhancements undertaken by Inslaw at private expense after the cessation of LEAA funding; and

(3) the so-called "Printed Inquiry" enhancement, which was created under contract to the Bureau of Justice Statistics and delivered to the Department of Justice on May 17, 1982.

On August 11, 1982, Morris responded:

We agree that the original PROMIS, as defined in your letter of May 26, 1982, is in the public domain. We also agree that the "printed inquiry" enhancement is in the public domain. To the extent that any other enhancements to the system were privately funded by INSLAW and not specified to be delivered to the Department of Justice under any contract or other arrangement, INSLAW may assert whatever proprietary rights it may have.

Thus, it appeared that the parties had reached an understanding. But as a matter of fact, this was not so, and the relationship between them during implementation of this contract was characterized by what appears to have been unusual controversy. There was unending contention about payment under this contract and the rights of the respective parties.

At the time that this contract was entered into, DOJ's Project Manager overseeing it was C. Madison Brewer. From November 1974 to April 1976 Brewer had been employed by INSLAW's predecessor as its general counsel. The nature and circumstances of his separation from that employment are somewhat in dispute, but it is clear that Brewer was not happy in his job when he left it after being urged to do so by Hamilton.

INSLAW attributed its troubles to an acute bias on the part of Brewer, who according to it was intent on running the company out of business. INSLAW lodged many complaints of bias and made several requests of DOJ to investigate these complaints and give some relief from what it perceived to be grossly unfair treatment. DOJ made no meaningful response to these complaints, and INSLAW's fortunes did not change.

On November 19, 1982, DOJ's technical representative formally requested a copy of the PROMIS software that was then in use by the U.S. Attorneys' Offices. According to the Justice Department the request was motivated by concern over the financial viability of INSLAW. It is without dispute that because the government had not obtained the minicomputer hardware for each office, INSLAW arranged for the largest U.S. Attorneys' Offices to use PROMIS on a time-sharing basis. In other words, because INSLAW could not install its software in the individual offices due to the government's failure to procure computer equipment, the U.S. Attorneys' Offices were nonetheless allowed to connect-up through telephone lines to IN-SLAW's computer center and use the enhanced version of PROMIS that INSLAW had been providing to its other non-Justice Department customers. INSLAW took the position that the Justice Department had no right to the enhanced software that the U.S. Attorneys' Offices had been using since this software had been provided to the Justice Department as a courtesy. DOJ countered that the contract obligated INSLAW to use public domain software for its implementation and that if proprietary enhancements had been added, it was up to INSLAW to prove it.

In an effort to respond to the Justice Department's alleged concern over its financial viability, INSLAW first offered to provide the Justice Department with enhanced PROMIS if the government would agree to limit its distribution to the 94 U.S. Attorneys' Offices and the EOUSA. The government, however, insisted that under its contract, INSLAW must provide software without restriction on distribution. INSLAW then offered to put copies of the

disputed software in escrow, so that if IN-SLAW went bankrupt, then the government would receive the enhanced software and its interest would still be protected. DOJ rejected INSLAW's escrow proposal.

Ultimately the parties sought to resolve their dispute by entering into a modification of the contract. Modification 12, as it became known, entered into on April 11, 1983, contained the following provisions:

INSLAW would deliver to the government all PROMIS programs and supporting documentation developed for or relating to the contract.

The government shall restrict the distribution of the software to the Executive Office for the U.S. Attorneys and the ninety-four U.S. Attorneys' offices pending resolution of the dispute.

DOJ agreed to continue to make advance payments to INSLAW.

INSLAW agreed to abide by the contractual provisions relating to advance payments.

The parties reaffirmed their understanding that their initial contract governs the rights to the disputed software.

Shortly after the parties agreed to Modification 12, the government terminated the component of the contract that would have automated 74 offices using word processors. The parties disputed whether Modification 12 continued to apply to all 94 U.S. Attorneys' Offices originally in the contract or instead to only the remaining 20 large offices.

Although INSLAW and the Justice Department negotiated over the enhancements that INSLAW indicated that it had included in the proprietary version of PROMIS, the parties could not agree that the enhancements had been paid for with non-government funds. While INSLAW made several efforts to demonstrate the private financing of the enhancements, the government did not accept its methodology for allocating funding. When asked to provide an alternative methodology that would be acceptable, the government declined.

Between August 29, 1983 and February 18, 1985, INSLAW installed PROMIS in all 20 U.S. Attorneys' Offices as provided for under the contract. INSLAW implemented the enhanced version of the software.

On February 7, 1985, shortly before completing the contract with the Justice Department, INSLAW filed for reorganization under Chapter 11 of the bankruptcy code. From the outset of the proceedings in the bankruptcy court, DOJ represented itself as a major creditor of INSLAW.

Prior to bankruptcy, DOJ had developed a plan to implement PROMIS beyond the 20 offices called for under the contract. In September 1985, upon learning of these plans, INSLAW protested to DOJ that the government's efforts to copy and use PROMIS were unauthorized. Nonetheless, DOJ proceeded to automate 23 additional offices using PROMIS. INSLAW subsequently filed a claim against DOJ for $2.9 million, the value of the standard licensing fees for the number of offices which were then to receive the allegedly unauthorized copies of the software.

INSLAW instituted an adversary proceeding against DOJ in which it sought declaratory relief, an order enforcing the automatic stay, and damages for willful violation of the automatic stay. *Inslaw, Inc. v. United States*, Adv.Proc. No. 86–0069 (Bankr.D.D.C. June 10, 1986). DOJ responded to the complaint by filing a motion for withdrawal of the reference to the bankruptcy court and for dismissal of the complaint. Both of these motions were denied by the chief judge of the district court. *Inslaw, Inc. v. United States*, Adv. Proc. No. 86–0069 (D.D.C. January 1, 1987 and March 24, 1987). The bankruptcy court then bifurcated the case into two phases, liability (counts I–III) and damages (count IV) and set trial for July 20, 1987. *Inslaw, Inc. v. United States*, Adv.Proc. No. 86–69 (Bankr.D.D.C. July 20, 1987).

The first major turning point in the litigation occurred in late May and June, 1987. At that time, the bankruptcy court held an evidentiary hearing on INSLAW's allegations that the Justice Department had violated the automatic stay by attempting to convert INSLAW's bankruptcy from a reorganization under Chapter 11 to a liqui-

dation under Chapter 7.[1] After six days of testimony, on June 12, 1987, the court ruled that the Department of Justice violated 11 U.S.C. § 362(a), the automatic stay provision of the bankruptcy code, and found the government liable under 11 U.S.C. § 362(h) for compensatory damages, costs and attorneys' fees. The court also held that if § 362(h) did not allow recovery against the government, then in the alternative, the government was in contempt of court for its actions. From the bench, the court assessed compensatory damages of $1,000 as well as attorneys' fees and costs but reserved for later decision the question of whether punitive damages could be awarded against the government. In addition, the court granted INSLAW's request for an injunction against the Justice Department and the Executive Office of the U.S. Trustees ("EOUST") from having contact with the U.S. Trustee handling the IN-SLAW bankruptcy case but refused to bar the Justice Department from filing a proof of claim against INSLAW. The bankruptcy court order incorporating the bench ruling was issued on July 26, 1987.

After listening to 23 witnesses and reviewing over 280 exhibits during the adversary proceeding hearings (July 20 to August 5, 1987), in a bench ruling on September 28, 1987 the bankruptcy court announced its decision in favor of INSLAW and set forth the basic grounds for its ruling. In doing so, the court extensively discussed the testimonial evidence as well as key documents. In addition, the court made numerous credibility findings and described the motivations that different witnesses may have had and how their testimony might have been influenced. Basically the bankruptcy court found that Brewer had developed intense dislike for Hamilton and INSLAW and that when he obtained

the job as project manager of the contract between INSLAW and DOJ he set out to harm INSLAW, and that ultimately through him and others who acted with him and/or implicitly condoned his efforts, the DOJ converted INSLAW's enhanced PROMIS by trickery and deceit and was using and intended to continue to use IN-SLAW's enhanced PROMIS in a fashion not contemplated by the contract and in such manner as to damage INSLAW's estate. At the time of the bench ruling the court indicated that:

> Now, with respect to the adversary proceeding of Inslaw against the Department of Justice, I will make a generalized statement at this time and will request counsel for Inslaw to prepare a final judgment in accordance with this statement and will follow this statement with detailed written findings of fact and conclusions of law—

Tr. of Adversary Proceeding, *In re Inslaw, Inc.*, Adv. No. 86–0070 (Bankr.D.D.C. September 28, 1987) (Supp.App. at 43).

The bankruptcy court rendered the following relief:

(1) A declaratory judgment in favor of INSLAW that it is the sole owner of the proprietary enhancements to PROMIS.

(2) A declaratory judgment that the Justice Department wrongfully exercised dominion and control over INSLAW's software, and, as a result, violated the automatic stay.

(3) An injunction directing the Justice Department to be bound by the terms of INSLAW's standard license agreement and requiring the Justice Department to compensate INSLAW under the terms of the license agree-

---

**1.** Although the normal method for challenging a party who has violated the automatic stay is to bring an adversary proceeding, that did not occur in this instance. Instead, the court allowed INSLAW to present its charges under a pending motion INSLAW had filed to "obtain independent handling" of the case by the Department of Justice. Motion to Stay Effect of February 17, 1987 Order Retaining Nixon, Hargrave, Devans and Doyle for 30 Days and for Court Assistance to Obtain Independent Handling of the Case by

the Department of Justice, *In re Inslaw, Inc.*, Ch. 11, 85–0070 (February 25, 1987). In issuing its ruling, the bankruptcy court recognized that the matter should have been handled as an adversary proceeding. App. at 132, Transcript of Hearing on Independent Handling Motion at 1007, *In re Inslaw, Inc.*, Ch. 11, 85–0070 (June 12, 1987). However, after the investment of six days of hearings, the court was reluctant to "exalt ... form over substance." *Id.*

ment from the date when INSLAW filed for bankruptcy. The court cited *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518 (5th Cir.), *reh'g denied,* 505 F.2d 1304 (5th Cir.1974). The court left for a later hearing the precise amount due IN-SLAW.

(4) A prohibition against the Justice Department from electing to use only the older version of PROMIS without first compensating INSLAW for the cost of removing the enhancements.

(5) An injunction preventing several Justice Department officials who were involved in administering the IN-SLAW contract from further participation in the litigation, or in any decision involving the use of PROMIS at the Justice Department.

(6) An award of attorneys' fees and expenses to INSLAW.

*Id.* at 84–88. The detailed written findings of fact and conclusions of law in support of its decision were entered on January 25, 1988.

After subsequent hearings on count 4 of the complaint (damages) the court awarded $6.79 million to INSLAW. Also costs and attorneys' fees were awarded. These adverse rulings are the subject of this appeal.

INSLAW also sought legal remedies against the Justice Department before the Department of Transportation Board of Contract Appeals ("DOTBCA"). INSLAW filed notices of appeals with DOTBCA in February 1985, and May and November 1986. Subsequent to these notices, the first complaint before DOTBCA was filed on June 23, 1986, approximately two weeks after INSLAW instituted its adversary proceeding in bankruptcy court against the Justice Department for allegedly breaching the automatic stay provision. Additional claims were filed on September 19, 1986 and August 24, 1987. INSLAW's claims before DOTBCA fall into six categories: (1) computer time-sharing charges associated with the computer center operated by IN-SLAW and used by several U.S. Attorneys' Offices; (2) contract target fees and voucher payments withheld by the Justice Department and additional fees due INSLAW as a consequence of changes in the scope of work ordered by the Justice Department; (3) indirect costs, including overhead; (4) direct costs; (5) costs, including legal fees, allegedly incurred by Inslaw because of the termination for convenience by the Justice Department of the word processing portion of the contract; and, (6) costs incurred because the Justice Department withheld payments. In four cases, the government counterclaimed for an amount in excess of the original claim. The table below summarizes the parties' claims against each other before DOTBCA.

| Claim | INSLAW against DOJ | DOJ against INSLAW |
|---|---|---|
| 1. Computer Center Costs | $ 409,694 | $ 670,735 |
| 2. Fees | 331,447 | 35,534 |
| 3. Indirect Costs, including overhead | 569,751 | 466,868 |
| 4. Direct Costs | 92,844 | 43,615 |
| 5. Costs, including legal | 76,049 | |
| 6. Consequences of withheld payments | 109,777 | |
| Total | $1,589,562 | $1,216,752 |

On February 8, 1987, the bankruptcy court enjoined the DOTBCA proceedings. The Justice Department appealed and this court vacated the order of the bankruptcy court. In March 1989, this court also denied a motion by INSLAW to enjoin the DOTBCA proceedings. *United States v. Inslaw, Inc.,* C.A. No. 89–352 (D.D.C. March 29, 1989). The matter of whether to

allow the DOTBCA to proceed is not now before the district court.

### DISCUSSION

DOJ makes numerous arguments in support of its appeal:

(1) DOJ contends that under the doctrine of sovereign immunity, the bankruptcy court was without jurisdiction to decide the case. Even if the bankruptcy court had jurisdiction to decide the issues, it should have deferred to an agency board of contract appeals.

(2) DOJ argues that the facts do not support a conclusion that the automatic stay provision of the bankruptcy code had been violated.

(3) DOJ claims entitlement to *de novo* review. DOJ cites several reasons to support its notion of the standard of review, arguing that under 28 U.S.C. § 157(d), withdrawal of the proceeding to the district court was required, or alternatively, the bankruptcy court's findings should be treated as contempt of court. Lastly, in support of this claim, the Justice Department makes the serious charge that the bankruptcy judge was not impartial and should have removed himself. During the course of this litigation, the Court of Appeals for the District of Columbia chose not to reappoint the bankruptcy judge for a new fourteen year term. The Justice Department contends that the decision by the D.C. Circuit not to reappoint the bankruptcy judge and subsequent events may have biased or prejudiced the judge's behavior or, at least, given the appearance of impropriety.

(4) DOJ claims that the bankruptcy court was clearly erroneous in its findings of fact regarding both the adversary proceeding and the proceeding in which the court determined that the Justice Department had illegally attempted to convert INSLAW's reorganization to a liquidation.

(5) DOJ contends that as a matter of law, its actions, even if true, did not constitute a violation of law.

(6) DOJ believes that the bankruptcy court exceeded its authority when it granted relief.

(7) DOJ urges that no attorneys' fees or costs should have been awarded.

It is well settled law that absent waiver, the United States is immune from suit. *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Only Congress can waive sovereign immunity; and, such waivers are to be strictly construed. *Rose v. Rose*, 481 U.S. 619, 635, 107 S.Ct. 2029, 2038, 95 L.Ed.2d 599 (1987); *In re Donovan*, 877 F.2d 982, 994 (D.C.Cir.1989).

In enacting the bankruptcy code, Congress waived sovereign immunity in three instances.[2] First, once the government asserts a claim, immunity is waived for any counterclaim arising out of the same transaction or occurrence. 11 U.S.C. § 106(a). There is no limit on the amount of the counterclaim. Second, the government cannot claim immunity from any offset of an allowed claim of the government. The offset need not arise out of the same transaction or occurrence but, recovery is limited to the amount of the government's claim. 11 U.S.C. § 106(b) (1988). Finally, § 106(c) provides an additional waiver of sovereign immunity for those provisions of

---

**2.** Section 106 of the bankruptcy code, 11 U.S.C. § 106 (1988) provides that:

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose. (b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

the bankruptcy code that contain "trigger" words regardless of whether or not the government asserts a claim.

The bankruptcy court reasoned that DOJ had waived immunity under §§ 106(a) and (b), and also interpreted § 106(a) as sufficiently broad to bestow jurisdiction. DOJ urges that inasmuch as it had not filed a proof of claim against INSLAW, it had not waived its immunity under §§ 106(a) or (b). It also argues that the bankruptcy court's interpretation of § 106(c) was invalid.

■ In *Hoffman v. Connecticut Income Maintenance Dept.*, —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), the Supreme Court examined whether the eleventh amendment barred monetary recovery against a state under § 106(c).[3] Justice White construed § 106(c) narrowly, holding that because Congressional intent to abrogate the eleventh amendment was not unmistakably clear on the face of the statute, no waiver could be found. Nonetheless, even under a narrow reading of § 106(c), Justice White observed that § 106(c)(2) "is more indicative of declaratory and injunctive relief." 109 S.Ct. at 2823. Indeed, the government concedes that its "sovereign immunity is waived with respect to declaratory and injunctive relief entered pursuant to the automatic stay, section 362." Appellant's Brief at 51, n. 36. Thus, at a minimum, under § 106(c) the bankruptcy court had jurisdiction to assess the liability of the Justice Department for violating the automatic stay and for issuing declaratory and injunctive relief pursuant to the finding of liability.

For the bankruptcy court to award compensatory damages, attorneys' fees and costs, jurisdiction must be found in § 106(a). The bankruptcy court concluded that the filing of a formal proof of claim is not a prerequisite to a finding of a waiver of sovereign immunity under § 106(a). *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171, *reh'g denied*, 473 U.S. 926,

106 S.Ct. 18, 87 L.Ed.2d 696 (1985), mandates that Congressional intent be "unmistakably clear in the language of the statute." *See also Hoffman*, 109 S.Ct. at 2822. The language of § 106(a) makes no mention of the requirement of a proof of claim. Therefore, no requirement of a proof of claim should be assumed from the statute. Even if the court were to look beyond the face of the statute (contrary to the Supreme Court's teaching in *Atascadero*), the legislative history provides even more compelling evidence that no proof of claim need be filed.

■ The original version of § 106 would have predicated a waiver of immunity on the filing of a proof of claim by the government. Both the House and Senate bills contained the following language:

(a) A governmental unit *that files a proof of claim* under section 501 of this title is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

H.R. 8200, 95th Cong., 1st Sess., 324 (1977) and S. 2266, 95th Cong., 2d Sess., 313 (1978) (emphasis added). As enacted by Congress, §§ 106(a) and (b) make no mention of the proof of claim requirement; the reference to the filing of a proof of claim was dropped when the bill became law. The government contends that this was merely a stylistic change. The court is not persuaded by this argument. "What Congress rejected should not be injected." *In re Davis*, 20 B.R. 519, 521 (Bankr.M.D.Ga. 1982). Thus, the allowability of a counterclaim against the government does not require the filing of a formal proof of claim. *See also* Kennedy, "Automatic Stays Under the New Bankruptcy Code," U.Mich.J.L. Ref. 1, 30 n. 120 (1978).

Moreover, § 101(4) defines "claim" very broadly.[4] The definition is a substantial

---

3. This case was stayed pending the decision in *Hoffman* inasmuch as it appeared that it would have a direct bearing on a critical aspect of this case.

4. Section 101(4) reads:

Claim means—

departure from the prior law in which a claim was tied to the concept of provability in an effort to limit the kinds of debts that could be paid in a bankruptcy proceeding. *See* 2 Collier on Bankruptcy, § 101.4 (15th ed., 1989). Under the present law, many more types of rights are considered claims and are subject to the bankruptcy code. The notion of the filing of a formal proof of claim seems inconsistent with this section of the bankruptcy code as well as § 106(a).

The government's actions throughout the course of the litigation suggest a calculated decision to assert its claims against Inslaw until such time that it appeared that the government had more to lose than to gain. The government should not be allowed to hide behind its shield of sovereign immunity once it enters the fray and manifests a clear intent to put the debtor at risk for its monetary claims.

The existence of the government's claims can be derived from its conduct. Specifically, according to testimony before the bankruptcy court, the government attended the meeting of unsecured creditors. In at least one meeting in March 1985, counsel for the Justice Department asserted the government's status as a creditor. In a motion made to the bankruptcy court contesting the application of INSLAW's attorneys for interim compensation, the government stated that its standing to object rested upon the fact that the United States was "a creditor of debtor Inslaw, Inc." Objection by the United States to the Application for Interim Compensation, *In re Inslaw, Inc.*, Ch. 11, 85–0070 (Bankr.D.D.C. April 17, 1985). In June 1985, the government represented itself to the bankruptcy court as "probably the largest unsecured creditor" of INSLAW. This representation was repeated to the bankruptcy court during a July 2, 1985 hearing of INSLAW's motion for a confidentiality order. Response by the United States to Debtor's Application for Confidentiality of Certain Information,

*In re Inslaw, Inc.*, Ch. 11, 85–0070 (Bankr. D.D.C. June 14, 1985). On the basis of this representation, the bankruptcy court recognized the United States as "one of the largest unsecured creditors in this proceeding." Opinion Concerning Application by Debtor to Hold Certain Information in Camera, *In re Inslaw, Inc.*, 85–0070 (Bankr.D.D.C. July 15, 1985) (App. at 103).

When the United States appealed the bankruptcy court's decision regarding the confidentiality order, it again repeatedly represented itself as a major unsecured creditor. Memorandum of the United States in Opposition to INSLAW's Motion to Dismiss at 1–3, (Supp.App. at 4–6). In the same filing, government counsel flatly proffered that "the United States will assert a claim in this bankruptcy." *Id.* at 2 (Supp.App. at 5). On July 7, 1987, in a memorandum to support its Motion in Limine, the United states declared that it has asserted counterclaims against INSLAW in the amount of $1.45 million. Memorandum of the United States in Support of Its Motion in Limine, *In re Inslaw, Inc.*, Adv. No. 86–0069 (Bankr.D.D.C. July 7, 1987). Two and one-half weeks later, the Justice Department responded to INSLAW's First Set of Interrogatories and reiterated that "DOJ claims that Inslaw owes $1,491,335." Defendant's Supplemental Answers to Plaintiff's First Set of Interrogatories, *In re Inslaw, Inc.*, Adv. No. 86–0069 (Bankr. D.D.C. July 27, 1987). In addition, the United States asserted more than $1.2 million in counterclaims against INSLAW in the action pending before DOTBCA.

■ In short, the United States took numerous affirmative steps to assert its claims against INSLAW. The government behaved like a creditor, involved itself directly in the deliberations of INSLAW's efforts to reorganize and, made express representations during the bankruptcy proceeding to the bankruptcy court and this court. Moreover, it asserted more than $1

---

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

million in claims in another forum. By its actions, under § 106(a) and the broad definition of claim found in § 101(4), the United States has waived its immunity.

Even if some requirement of a proof of claim could be read into the statute, the government's actions constitute an informal proof of claim. For a document to constitute an informal proof of claim, it must "state an explicit demand showing the nature and amount of the claim against the estate, and evidence an intent to hold the debtor liable." *In re Anderson–Walker Industries, Inc.*, 798 F.2d 1285, 1287 (9th Cir.1986) (citing *In re Sambo's Restaurants, Inc.*, 754 F.2d 811, 815 (9th Cir. 1985)). Thus, while mere notice of a claim will not suffice, where it is apparent to the bankruptcy court that the creditor intends to seek recovery from the estate and when this intent is made known before the bar date, then an informal proof of claim has been properly filed. *In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1217 (11th Cir.1985).

In reaching its decision that the government had filed an informal proof of claim, and thus had waived sovereign immunity under § 106(a), the bankruptcy court relied upon *In re Davis*, 20 B.R. 519 (Bankr.M.D.Ga.1982). It concluded that:

The government should not be permitted to defeat Inslaw's claim against it on the ground that it has not filed a formal proof of claim and hence has not waived sovereign immunity, and then later be able to obtain a distribution from Inslaw's assets by perfecting its already-asserted informal proof of claim. Such a result would offend equity and conscience. "Fairness requires that a governmental unit cannot make an informal or incomplete claim to protect its right to share in subsequent distribution and also assert sovereign immunity."

76 B.R. 224, 230 (quoting *In re Davis*, 20 B.R. 519, 523 (Bankr.M.D.Ga.1982)).

The government counters that *Davis* is the only case where an informal claim has been sufficient to waive sovereign immunity under § 106(a). However, *Davis* and the bankruptcy court have made the logical extension from numerous courts that have concluded that a proof of claim can be found once a creditor indicates the nature and amount of his claim and indicates his intent to file a claim. *See In re Anderson–Walker Industries, Inc.*, 798 F.2d 1285, 1287–88 (9th Cir.1986); *In re Sambo's Restaurants, Inc.*, 754 F.2d 811, 815 (9th Cir. 1985); *In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1217 (11th Cir.1985). These decisions are wholly consistent with the bankruptcy code.

The government points out that inasmuch as it has stated for the record (after the issue was raised) that it does not intend to perfect its claim by filing a formal proof of claim, there is no possibility of the government participating unfairly in any distribution of INSLAW's estate. However, in effect this renunciation is more damaging to the government's position than it is helpful. Obviously it realizes that but for its expressed renunciation of its intent to perfect its claim, it has already sufficiently asserted a claim so as to be able to perfect it—even beyond the bar date for filing. In other words, the government attempts to kill a live claim by renouncing its intention to follow through on it. Under its theory the United States is privileged to raise and lower its protective canopy of sovereign immunity at will—depending upon the relative advantages of so doing at any particular time. Conceivably, if we were to accept this proposition the government could assert a claim as it has here, and then delay amending it by the "formal proof" until after the statute of limitations had run on some conduct which clearly would have been the basis of a valid counterclaim. There is no indication that the statute contemplates such mischief.

In sum, this court is convinced that under the statutory scheme enacted by Congress, the bankruptcy court correctly exercised its jurisdiction over the United States Justice Department. First, under § 106(c), the bankruptcy court had jurisdiction to hear claims seeking injunctive and declaratory relief. Second, by its actions in portraying itself as a creditor and asserting claims against Inslaw the government waived its immunity under § 106(a) to In-

slaw's counterclaims for monetary damages. Thus, the government's sovereign immunity had been effectively waived. Moreover, because § 106(a) forms the basis of the waiver, it is complete; the entire bankruptcy code applies including those provisions such as § 362(h) which provide for monetary damages.

■ The government next argues that even if the bankruptcy court properly had jurisdiction over the parties, it should have deferred to a specialized agency appeals board. According to the government, where issues of government procurement are involved, deferral is mandatory.

The government's argument assumes that, in essence, INSLAW's claims against the government are rooted in government contract law. If that were so then the proper forum for relief would be the Department of Transportation Board of Contract Appeals with a right of appeal to the claims court. *See In re Gary Aircraft Corp.*, 698 F.2d 775, 780–84 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983) (because government contracting law tends to be "technical and esoteric" and there exist specialized fora to resolve such disputes, the liquidation of claims arising out of a contract dispute should be deferred to an agency board of contract appeals).

But the issues in the instant case do not involve the liquidation of a contract claim. Indeed, INSLAW's case is squarely grounded in bankruptcy law. It seeks relief for alleged violations of the automatic stay provision of the bankruptcy code. It is hard to think of a provision more central to bankruptcy policy than the automatic stay provision.

In a case that appears factually quite close to the present dispute, the D.C. Circuit has held that deferral was not only not required but was inappropriate. *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir. 1982). In *Megapulse*, a government contractor sought to enjoin in district court, the dissemination of proprietary trade secrets by the Coast Guard. The government claimed under the contract it had lawfully gained a right to the contractor's

trade secrets. Since the dispute involved contract law, the appropriate adjudicatory mechanism was through agency review and ultimately to the claims court. The district court agreed, but the D.C. Circuit did not.

The Circuit held that the mere existence of a contract is not dispositive of which forum is most appropriate. "The mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract ..." 672 F.2d at 968. Like the Justice Department in the instant case,

> [i]t is actually the government, and not Megapulse, which is relying on the contract, attempting to show that the Coast Guard lawfully came into possession of the property and is empowered by the contract to put the entrusted information out for commercial use.... [W]e do not accept the Government's argument that the mere existence of such contract-related issues must convert this action to one based on the contract. This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds.

672 F.2d at 969–70.

The record shows that the bankruptcy judge properly used his discretion to decide a question of law regarding the ownership of the enhanced PROMIS software that was ancillary to his determination of whether there had been a violation of the automatic stay. Because the matter before the bankruptcy court sounded in bankruptcy law, no deferral was necessary.

The government urges the court to review the bankruptcy Court's finding *de novo*. First, the government contends that because issues presented in the instant case involved consideration of both the bankruptcy code and other laws affecting interstate commerce, the chief judge of this court incorrectly refused to withdraw the reference of the case to the bankruptcy court. Second, DOJ argues that the bankruptcy court's findings of fact and determination of liability were made under that

court's general civil contempt power and thus must be reviewed *de novo*. Alternatively, the government claims that because the bankruptcy court purportedly violated its pretrial order, the government is entitled to a new trial. Finally, the Justice Department makes the serious charge that the bankruptcy judge exhibited the appearance of bias and therefore, should have recused himself. This is the second time the government has made this charge. The government filed a petition for writ of mandamus with the district court seeking an order requiring the bankruptcy judge to disqualify himself. The chief judge of this court denied that writ. *In re United States*, Misc. No. 88–0032 (D.D.C. January 25, 1988). The government now asks this court to declare that recusal was in order and grant a new trial. For the following reasons, the clearly erroneous standard of review will be applied to the bankruptcy court's findings of fact and no new trial will be granted.

■ The standard of review for a core proceeding as defined by 28 U.S.C. § 157 is set forth in Bankruptcy Rule 8013:

> Disposition of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact
>
> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

The Advisory Committee Note to Rule 8013 indicates that the appropriate standard of review of the findings of a bankruptcy court should be the same as the review standard accorded a district court under Rule 52 of the Federal Rules of Civil Procedure. *See also Briden v. Foley*, 776 F.2d 379, 381 (1st Cir.1985) (Rules 7052 and 8013, which require the application of the clearly erroneous standard to a bankruptcy court's findings of fact, are constitutional as applied to core proceedings); 1 Collier on Bankruptcy, § 3.13[7] (15th ed. 1989).

Of course, issues of law are reviewed *de novo*. *In re Contractors Equipment Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988).

There is little doubt that an adversary proceeding represents a core proceeding. The bankruptcy code so provides. Core proceedings under 28 U.S.C. § 157(b)(2)(A) (Supp. II 1983) include "matters concerning the administration of the estate." The allegation by INSLAW that the government exercised unlawful dominion and control of its PROMIS software surely would satisfy this provision. In addition, further support can be found in subsection § 157(b)(2)(C) which makes "counterclaims by the estate against persons filing claims against the estate" core proceedings. By inference, § 157(b)(2)(G) which defines "proceedings to terminate, annul, or modify the automatic stay" as core proceedings lend additional justification. In analyzing this question, the Fourth Circuit has taken the well-reasoned view that proceedings to prosecute the automatic stay are core proceedings under the bankruptcy code. *See Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir.1986). Consequently, because prosecution of a violation of the automatic stay is a core proceeding and Congress has accorded bankruptcy judges the power to make factual findings in such proceedings, the standard of review as set forth in Bankruptcy Rule 8013 is that of clear error.

For the same reasons, the government's contention that the bankruptcy court's findings of fact were made under the court's general contempt power also appears to be misplaced. INSLAW's allegation that the government illegally attempted to convert its Chapter 11 reorganization into a Chapter 7 liquidation unquestionably falls within § 157(b)(2)(A). As such, it is a core proceeding. Similarly, INSLAW's charge that DOJ illegally appropriated its property and sought to distribute it without regard to INSLAW's claimed proprietary interest, at a minimum, threatened the estate under § 157(b)(2)(A) and was a counterclaim under § 157(b)(2)(C). Both the alleged illegal conversion and the misappropriation of property could properly be contested in an

adversary proceeding which as demonstrated *supra* is a core proceeding. Therefore, the powers vested to the bankruptcy court under the automatic stay provision, 11 U.S.C. § 362, do not violate the Constitution as the government claims. *See Budget Service Co. v. Better Homes of Virginia*, 804 F.2d at 292–93, ("bankruptcy courts acting through bankruptcy judges may enforce the sanctions of § 362(h) without reference to a finding of civil contempt"). Furthermore, under § 362(h), a debtor may recover actual damages, including costs and attorneys' fees. Thus, the standard of review in this case is not the standard applicable for civil contempt, but rather is the clearly erroneous standard relevant for core proceedings.

The government next suggests that the chief judge of this court erred when he did not agree to withdraw to the district court the referral of the bankruptcy case. Section 157(d), in pertinent part, states:

> The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (Supp. II 1983).

■ The relevant test of whether a bankruptcy matter should be withdrawn to the district court is whether the district court judge can make "an affirmative determination that resolution of the claims will require substantial and material consideration of those non-[bankruptcy] code statutes." *In re White Motor Corp.*, 42 B.R. 693, 705 (N.D.Ohio 1984). It is only those cases which require a significant interpretation of federal laws that must be withdrawn. *See In re Johns–Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y.1986) (favorably applying *In re White Motor*).

■ In the instant case, the allegation of the illegal conversion of INSLAW's bankruptcy case implicates no federal law other than the bankruptcy code. The adversary proceeding which involved an issue over the ownership and control of the PROMIS software appears to this court to

require first, an analysis of the scope of work and then, an interpretation of a contract. In interpreting the contract, a bankruptcy court may have to apply federal procurement regulations, but it is not apparent that there need be any substantial interpretation of federal laws by the bankruptcy court. Therefore, the court concurs in the decision of the chief judge not to withdraw the case from the bankruptcy court.

The government also contends that the bankruptcy court violated its pretrial order limiting the scope of the adversary proceeding. As a result, the government did not put on its case with regard to certain matters and now claims that the result was fundamentally unfair and prejudicial. On July 20, 1987, the bankruptcy court entered an order which sought to restrict phase I of the adversary proceeding to whether INSLAW maintained ·a proprietary right to the PROMIS software and whether C. Madison Brewer was biased and lacked impartiality towards INSLAW. Order Limiting Issues to be Tried at This Time, *In re Inslaw, Inc.*, Adv.Proc. No. 86–0069 (Bankr.D.D.C. July 20, 1987). The bankruptcy court sought to reserve until a later date the litigation over several contract-specific questions such as the allocation of computer time-sharing costs, termination of the word processing portion of the contract, overhead rates, DOJ's alleged withholding of fees and INSLAW's proposal to substitute computers for word processors. In addition, the court also sought to delay the presentation of whether DOJ negotiated in good faith and the determination of DOJ's counterclaims and/or offsets against INSLAW, as well as the post-petition acts of Dean Cooper. *Id.*

What is clear from the bankruptcy court's conclusions of law is that the court held to its mission as described in its pretrial order. The court's six principal conclusions of law are that: (1) INSLAW's proprietary enhancements are entitled to protection as trade secrets; (2) DOJ unlawfully used those enhancements in violation of the automatic stay; (3) the failure of DOJ to cure the fraud by which it induced

INSLAW to enter into Modification 12 represents a further violation of the automatic stay; (4) the failure of DOJ to correct bias against INSLAW also represents a violation of the automatic stay; (5) INSLAW is entitled to permanent injunctive relief; and (6) INSLAW is entitled to costs and attorneys' fees. A comparison of the conclusions of law and the pretrial order show a close correlation. While there may have been some overlapping factual questions among the issues tried in phase I and those reserved for a later determination, the court cannot agree that the bankruptcy court violated its pretrial order.

■ Moreover, the bankruptcy court may amend its pretrial order to conform to the evidence. Bankruptcy Rule 7016 which would control the issuance of pretrial orders applies Fed.R.Civ.P. 16. Under the federal rules, district court judges have broad discretion to depart from their pretrial orders. *See Patterson v. Woolworth Co.*, 786 F.2d 874, 879 (8th Cir.1986) ("flexible application of pretrial orders" is reserved to the sound discretion of the district court); *Robert v. Conti Carriers & Terminals, Inc.*, 692 F.2d 22, 24 (5th Cir. 1982) (trial judges have discretion to admit evidence not included in pretrial order). Absent a clear showing of abuse of discretion, the trial court's decision should · be accepted. *Lirette v. Popich Bros. Water Transport, Inc.*, 660 F.2d 142, 144 (5th Cir.1981). The court is satisfied that the government did not suffer any undue prejudice when the bankruptcy court made its findings of fact. No new trial on those issues is indicated.

Lastly, in arguing for a new trial on the issues the government contends that Judge Bason should have recused himself and that the appearance of impropriety tainted his decision. The factual setting involves the decision on January 11, 1988 by the United States Court of Appeals for the District of Columbia Circuit not to reappoint Judge Bason to a fourteen-year term. Subsequent to that decision, Judge Bason

wrote a lengthy letter to Chief Judge Wald of the D.C. Circuit. In this letter, Judge Bason described his credentials, questioned the validity of the reasons given for why he was not reappointed, and raised the possibility that other unstated reasons may have led the court of appeals not to reappoint him. Within one week, two newspapers carried accounts of Judge Bason's letter. Washington Post, January 18, 1988; Legal Times, January 18, 1988. The government claims that the decision not to reappoint Judge Bason tainted his judgment in the case and that his letter to Chief Judge Wald and the press reports gave the appearance of impropriety.

On January 19, 1988, the government first filed a motion before Judge Bason requesting that he recuse himself. After a hearing on January 22, the bankruptcy court denied the government's motion in a memorandum and order filed January 25, 1988. On the same day, the government argued a motion before the chief judge of the district court for a writ of mandamus directing Judge Bason to recuse himself. The chief judge denied the government's writ in a bench ruling. *In re United States and the United States Department of Justice*, Misc.Case No. 88–032 (D.D.C. January 25, 1988).

In its motions before Judge Bason and Chief Judge Robinson, the government cites two recusal statutes, 28 U.S.C. § 144 and 28 U.S.C. § 455. While there is no disagreement over the applicability of 28 U.S.C. § 455, INSLAW argues and Judge Bason agrees that 28 U.S.C. § 144 does not apply to bankruptcy judges.[5] In any case, it is unnecessary to decide the legal question, because under any standard, the evidence put forth by the government is insufficient.

As evidentiary support for its motion for recusal, the government relied on the letter sent by Judge Bason to Chief Judge Wald, the press reports and, to satisfy the requirements of § 144, an affidavit of Depu-

---

5. Although Chief Judge Robinson may have been confronted with the question of the applicable statute, he does not address the question. In his oral ruling from the bench, it is apparent

that the standard he applies is 28 U.S.C. § 455. Transcript at 33, *In re the United States and the United States Department of Justice*, Misc. Case No. 88–032 (D.D.C. January 25, 1988).

ty Assistant Attorney General Stuart Schiffer. The deputy assistant attorney general's affidavit contains no facts based on personal knowledge. Instead, the affidavit recites the press accounts.

As Chief Judge Robinson noted:

I can't see anything in this record that measures up to the standards that would be applicable to force another judge to take over this case. There isn't any doubt in my mind, for example, that the declaration filed in support of the original motion is inadequate.

Tr. at 33, *In re the United States and the United States Department of Justice,* Misc.Case No. 88–032 (D.D.C. January 25, 1988) (Supp.App. 125). This court agrees.

██ Press accounts are simply an inadequate basis for requiring recusal. "Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers." *In re United States,* 666 F.2d 690, 695 (1st Cir.1981). An affidavit that relies solely on press accounts cannot be legally sufficient. Lastly, a careful examination of Judge Bason's letter in no way demonstrates a predisposition or bias in this case. This court, like the courts before it, can find no basis in fact to support a motion for recusal.

The events leading up to the government's motion for recusal occurred long after Judge Bason made his extensive bench rulings on liability which constitute the basis of his later memorandum opinion and order. Judge Bason made his oral ruling on the unlawful attempt to convert INSLAW's bankruptcy on June 12, 1987 and followed with a memorandum opinion on July 20, 1987. A bench ruling on DOJ's liability in the main adversary proceeding was announced on September 28, 1987, more than three and one-half months before the judge learned that he would not be reappointed. Although no written findings had been filed by the time Judge Bason learned that he would not be reappointed, the die had been cast. Government liability

had already been assessed in no uncertain terms. The only untried part of the case that remained involved damages.

The government accuses the bankruptcy court of looking beyond the bankruptcy proceeding to find culpability by the government. What is strikingly apparent from the testimony and depositions of key witnesses and many documents is that INSLAW performed its contract in a hostile environment that extended from the higher echelons of the Justice Department to the officials who had the day-to-day responsibility for supervising its work. While the focus of the review must be on the actions taken by the Justice Department once INSLAW filed its petition for bankruptcy, the context of those actions cannot be fully appreciated without a thorough understanding of the underlying events and facts leading up to the bankrupcy.

The transcripts reveal that the bankruptcy judge kept close track of the evidence as it developed. This is reflected in frequent references to his notes, and his occasional questions to witnesses about what appeared to be critical evidence; and his attention to detail in both his oral and written rulings demonstrate a mastery of the evidence. This is apparent from the vast majority of the record citations in support of the various findings.

It is not necessary to duplicate the bankruptcy court's exhaustive findings of fact here. It is sufficient to state that after careful review of all of the volumes of transcripts of the hearings before the bankruptcy court, the more than 1,200 pages of briefs and supporting appendices and all other relevant documents in the record, there is convincing, perhaps compelling support for the findings set forth by the bankruptcy court.

In accordance with the principles set out in *Anderson v. Bessemer City,* 470 U.S. 564, 571–75, 105 S.Ct. 1504, 1510–12, 84 L.Ed.2d 518 (1985), the court has examined the bankruptcy judge's findings of fact in the light of the entire record, and finds that his account of the evidence is eminently plausible; and this court is not left with any notion that a "mistake has been com-

mitted." *Id.* at 574, 105 S.Ct. at 1511. This conclusion is reached without regard to the deference to be accorded to the judge's opportunity to assess credibility. The cold record adequately supports his findings under any standard of review. Accordingly the findings will not be disturbed.

With regard to the conclusions of law, the court believes that the facts support the multiple violations of the automatic stay that the bankruptcy court found. 11 U.S.C. § 362(a)(3) provides that "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is a violation of the automatic stay.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6296–97.

 It is not necessary to consider which party was entitled to the enhanced PROMIS software under INSLAW's contract with the Justice Department. At a minimum, the Department of Justice knew that INSLAW disputed the government's claim of ownership of enhanced PROMIS. It also knew that PROMIS represented INSLAW's principal asset and that without ownership of the software, the company's economic viability was threatened. Instead, of following the orderly procedures established by the bankruptcy code for resolving its dispute with INSLAW and seeking relief from the automatic stay, DOJ pursued a course of self-help. It claimed enhanced PROMIS to be its property and installed it in at least 45 offices throughout the United States. By these actions, DOJ violated the automatic stay.

*See First Nat'l Bank of Portsmouth, New Hampshire v. Cope,* 385 F.2d 404 (1st Cir.1967). In that case a bank creditor held a secured interest in the debtor's automobile. For the purpose of deciding the case, the court assumed that the bank was legally entitled to repossess the car. Nonetheless, when the bank acted unilaterally and did repossess the car, the First Circuit held that its actions were unlawful. Although not addressing the automatic stay provision specifically, the First Circuit's insight appears to have application to this case.

> It should require but little imagination to envisage the serious consequences to orderly and, indeed, effective, bankruptcy administration that would ensue from the recognition of the principle advocated by the bank. Every creditor who believed, albeit mistakenly that he had a right to property in the possession of the court, and perhaps some who did not believe it, but were willing to take the risk to improve their position, would seize that property. The trustee, instead of administering the estate, would be busy policing or endeavoring to regain possession of it. Particularly in a Chapter XIII proceeding, the whole purpose of which is to rehabilitate the debtor, the taking of assets vital to the conduct of his affairs might foreclose success. The requirement that even those who are correct in their belief that they are entitled to the return of property should have to go through orderly proceedings, *In re Pappas,* S.D. Ohio, 1962, 216 F.Supp. 819, and suffer consequences if they do not, is small price to pay.

385 F.2d at 406. *See also In re Motley,* 10 B.R. 141 (Bankr.M.D.Ga.1981) (creditor cannot exercise self-help; it must follow orderly procedures).

The court concurs with the bankruptcy court's conclusion that DOJ fraudulently obtained and then converted enhanced PROMIS to its own use. Prior to entering into Modification 12, INSLAW first proposed that DOJ be given the enhanced PROMIS for its use at no additional charge. After this proposal was rejected, INSLAW next proposed that a copy of the existing software be put in escrow which

would become available to DOJ if INSLAW went out of business. Again, DOJ rejected INSLAW's proposal. It was not until IN-SLAW agreed to turn over its version of enhanced PROMIS that DOJ entered into Modification 12 and withdrew its threat of stopping the advance payments to IN-SLAW thereby averting a cash flow crisis that would have thrown the company into bankruptcy. These efforts to obtain a copy of the proprietary software were taken even though the government had yet to acquire the computer hardware on which the software could run. These facts are not in dispute. Thus, the court is drawn to the same conclusion reached by the bankruptcy court; the government acted willfully and fraudulently to obtain property that it was not entitled to under the contract.

Once the software was in the possession of DOJ, there is no evidence that the government ever negotiated in good faith over the existence of the proprietary enhancements claimed by INSLAW. The DOJ put the entire onus of proof on IN-SLAW, yet never indicated what methodology or proof would be acceptable. The contract entered into by the parties entitled the government to the version of PROMIS then in the public domain. The expert witnesses demonstrate that INSLAW did enhance the software with private funds. The contract did not entitle DOJ to these enhancements. By failing to acknowledge or accept INSLAW's claims, the government continued its fraudulent behavior toward INSLAW. This behavior persisted long after INSLAW filed for reorganization. DOJ's actions constitute a violation of the automatic stay by exercising control over property that rightfully belonged to the estate.

With regard to the government's abortive attempt to convert Inslaw's reorganization into a liquidation, the court can think of no greater violation of the automatic stay than to cause the demise of the corporate entity.

The next issue raised by the government is whether the award of damages by the bankruptcy court was proper and within the court's authority. The bankruptcy court awarded monetary damages of $6.79 million for violations of the automatic stay regarding the unlawful conversion of PROMIS. In addition, monetary damages of one thousand dollars were assessed against the Justice Department for attempting to convert INSLAW's reorganization to a liquidation. The court declared that INSLAW was the sole owner of enhanced PROMIS and had the exclusive right to sell or lease the software; enjoined DOJ from further installing PROMIS in any more offices or from disseminating PROMIS to any person outside of DOJ; further enjoined three Justice Department officials from any future involvement with INSLAW or PROMIS; and, awarded attorneys' fees and costs.

█ Considering first the monetary damages and attorneys' fees issues, § 362(h) directs that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees." The bankrupty court estimated INSLAW's damages to be calculated in accordance with the perpetual license fees for the PROMIS software. The government contends that the calculation of license fees that INSLAW would have collected was not a proper measure of damages. DOJ claims that the effect of the court's order amounted to forcing the government to enter into a contract. Furthermore, the government argues that the license fees fail to measure the actual damage to IN-SLAW. According to DOJ, even if the bankruptcy judge was correct in using license fees to calculate actual damages, the fees overstate the value of INSLAW's actual harm.

Contrary to what the government contends, the bankruptcy court did not impose a contract upon the parties. Instead, the trial court discharged its responsibility to assess damages based on the evidence adduced at trial. The bankruptcy court's conclusion is supportable based on the evidence in the record and as a matter of law. INSLAW proved to the satisfaction of the bankruptcy court the fair market value of its software by putting on experts versed

in the valuation of software. Furthermore, other courts have held that license fees are an acceptable measure of damages in a variety of contexts.

Where the misappropriation of intellectual property has been the product of tortious conversion, license fees have been used to measure damages. *See e.g. Compumarketing Serv. Corp. v. Business Envelope Mfgs., Inc.*, 342 F.Supp. 776, 778 (N.D.Ill.1972) (usage fee for a mailing list converted by defendant is the measure of damages). Similarly, in cases involving patent infringement comparative royalties are accepted as a proxy. *Clark v. Wooster*, 119 U.S. 322, 326, 7 S.Ct. 217, 218, 30 L.Ed. 392 (1886) (with regard to patent infringement, established license fees are the most reliable measure of damages); *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 599 F.2d 958, 973 (Ct.Cl.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Where trade secrets have been misappropriated, license fees have again been used as the proper measure of damages. *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535–45; *reh'g denied*, 505 F.2d 1304 (5th Cir.1974); *Vitro Corp. of America v. Hall Chem. Co.*, 292 F.2d 678, 683 (6th Cir.1961). Thus, under a variety of legal settings, license fees have been used to calculate damages.

While the government makes several arguments to support its notion that the license fees overstate the value of the software to the government, only one merits further discussion. Twelve percent (12%) of INSLAW's standard license fees pay for the first year's maintenance charge of the software. Since the bankruptcy court did not force the parties to enter into a contract and there is no dispute that INSLAW never provided this service, the compensatory damage award should be reduced accordingly. By the court's calculation, twelve percent of the license fees amounts to $655,200. It is by that amount that the compensatory damages award should be reduced.

Finally, the government asserts that INSLAW is not entitled to attorneys' fees. Section 362(h) is clear in its mandate that any individual injured by a willful violation of the automatic stay "shall recover actual damages, including costs and attorneys' fees." 11 U.S.C. § 362(h). The bankruptcy court made an award under the statutory authority of both § 362(h) and the "bad faith" exception to the American Rule pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(b). *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975) (under the American Rule, each party must pay its own fees). DOJ counters that § 362(h) does not apply for corporations and that its conduct does not meet the bad faith test. As discussed previously, a corporation can collect actual damages for the violation of the automatic stay. *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d at 292–93 ("bankruptcy courts acting through bankruptcy judges may enforce the sanctions of § 362(h) without reference to a finding of civil contempt"). Consequently, the bankrupcy court was correct in awarding attorneys' fees to INSLAW. There is no need to reach the question of whether the award was justified under the bad faith exception of 28 U.S.C. § 2412(b).

## CONCLUSION

In conclusion, the court has determined that the bankruptcy court's orders of July 20, 1987 and January 25, 1988 regarding liability and damages against the United States for unlawfully violating the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362, by attempting to convert appellee's pending bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation is AFFIRMED, 88 B.R. 484. The bankruptcy court's order of January 25, 1988 regarding liability of the United States for unlawfully violating the automatic stay provision of the bankruptcy code in phase I of the adversary proceeding (counts I, II and III) by exercising control over and proliferating the implementation of PROMIS is AFFIRMED, 83 B.R. 89. The bankruptcy court's order of February 2, 1988 regarding compensatory damages in phase I of the adversary proceeding (counts I, II and III) is MODIFIED in ac-

cordance with this memorandum so as to reduce the award by $655,200. Finally, the bankruptcy court's order regarding attorneys' fees in adversary proceeding No. 86–0069 is also AFFIRMED.