INSLAW, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–338X.

United States Court of Federal Claims.

May 11, 1998.

C. Neal Pope, Columbus, GA, for plaintiffs. Michael E. Friedlander, Alexandria, VA, James J. Malone III, Charles R. Work, Philip L. Kellogg, James L. Lyons, J.T. Westermeier, and Garry S. Grossman, Washington, DC, and Michael L. McGlamry, William U. Norwood, Earle F. Lasseter, and Wade H. Tomlinson III, Atlanta, GA, of counsel.

Sandra P. Spooner, U.S. Department of Justice, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger and Director J. Christopher Kohn, for defendant. Cathy J. Burdette, Beth E. Cook, and William Alvarado Rivera, U.S. Department of Justice, Washington, DC, of counsel.

Before the Review Panel: ERIC G. BRUGGINK, Judge, MARIAN BLANK HORN, Judge, and THOMAS J. LYDON, Senior Judge.

## REPORT OF THE REVIEW PANEL

*Per Curiam:*

Like many congressional-reference cases, this matter has taken a long and tortuous path. The following report represents the culmination of twelve years of litigation in five different fora. The dispute involves a Department of Justice (DOJ) contract with plaintiffs to develop and implement a litigation-management system in various U.S. Attorney's Offices (USAOs). The background facts are laid out in detail in the report of the hearing officer, *see INSLAW, Inc. v. United States*, 39 Fed.Cl. 307 (1997) [hereinafter *Report* ], and will not be repeated here.

The reference involves a $9.6 million, cost-plus-incentive-fee contract between DOJ and INSLAW, a for-profit corporation, to customize, prepare, and install the Prosecutor's Management Information System (PROMIS), a computerized case-management system, in various USAOs and the Executive Office of the U.S. Attorneys (EOUSA). Plaintiffs William Hamilton and Nancy Burke Hamilton are principals in INSLAW.

The dispute concerns the parties' respective rights and obligations in the original 1982 contract, as well as modification 12 to that contract. Plaintiffs' case centers on three demands or threats made by DOJ during the administration of the contract. First, DOJ requested that INSLAW provide a copy of the software developed under the contract. Second, DOJ threatened to discontinue use of an advance-payment system after learning that INSLAW improperly obtained commer-

cial financing using unpaid government invoices as backing. Third, DOJ stopped payment of a claim regarding computer-center costs because of accounting irregularities that resulted in an over-recovery by INSLAW. Plaintiffs contend that these threats or actions were not contractually authorized, were undertaken in bad faith, and caused serious economic loss to plaintiffs. Specifically, they contend that DOJ, in order to obtain the enhanced PROMIS software, threatened to cut off payments, improperly impeded INSLAW's attempts to prove the proprietary nature of enhancements, and unlawfully disseminated enhanced versions of PROMIS outside of the scope of the contract.

## PROCEDURAL BACKGROUND

The contract ended on March 15, 1985, when INSLAW delivered and installed the PRIME version of PROMIS. INSLAW filed a claim with the contracting officer (CO) on October 17, 1985, seeking a total of $4,108,-885 in miscellaneous costs and fees related to termination of a portion of the contract, changes to the contract, and to DOJ's alleged infringement of INSLAW's data rights.[1] This claim included $2,910,000 relating to licensing fees for proprietary enhancements. On February 21, 1986, the CO denied the claim for licensing fees and reserved judgment on other matters pending an audit.[2]

INSLAW entered bankruptcy under chapter 11 of the Bankruptcy Act in 1985. As part of the bankruptcy proceeding, it initiated an adversary proceeding against DOJ, seeking a declaratory judgment that it owned proprietary enhancements to PROMIS; a cease-and-desist order against DOJ to stop dissemination of the enhancements; and damages in excess of $10,000,000. The bankruptcy court found for the plaintiffs and granted the relief requested; the district court affirmed. *See INSLAW, Inc. v. United States*, 83 B.R. 89 (Bankr.D.D.C.1988), *aff'd*,

113 B.R. 802 (D.D.C.1989), *vacated*, 932 F.2d 1467 (D.C.Cir.1991). The District of Columbia Circuit vacated the judgment and opinion of the bankruptcy court, however, holding that INSLAW had no proprietary interest in software provided to DOJ prior to the filing of the petition for protection from its creditors and that hence the bankruptcy court did not have jurisdiction over INSLAW's claims.

During the time the adversary proceeding was in litigation, Congress conducted an investigation into plaintiffs' allegations. The result was a report issued by the House Committee on the Judiciary, which recommended settlement of INSLAW's claims and further investigations by DOJ into numerous allegations of misconduct in relation to the affair. *See* HOUSE COMMITTEE ON THE JUDICIARY, THE INSLAW AFFAIR, H.R. REP. NO. 102–857, at 113 (1992). The record does not reflect what actions, if any, resulted from that recommendation.

On May 1, 1995, Senate Bill 740 was introduced, which would provide compensation to plaintiffs for "damages incurred arising from claims relating to the furnishing of computer software and services to the United States Department of Justice." S. 740, 104th Cong. § 1 (1995). The Senate referred the bill to the Chief Judge of the Court of Federal Claims for a report

> giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due to the claimants from the United States.

S. Res. 114, 104th Cong. (1995).

On August 4, 1995, plaintiffs filed their complaint in this matter, pursuant to RCFC Appendix D, pleading the following counts: (1) violation of due process under the Fifth Amendment; (2) taking without just com-

---

1. This claim was one of many filed by INSLAW relating to this contract. A prior final decision addressed previous claims relating to computer-center costs and contract fees.

2. INSLAW also filed a separate claim for costs and fees. The claim was denied, and an appeal was taken to the Department of Transportation Contracts Appeal Board (DOTCAB). That matter

was dismissed by the DOTCAB after INSLAW voluntarily withdrew its claims. The matter before the DOTCAB only pertained to the CO's final decision regarding the over-recovery of computer-center costs by INSLAW. It did not include any determination of data rights or licensing fees.

pensation under the Fifth Amendment; (3) common-law fraud, misrepresentation, suppression, and deceit; (4) conversion; (5) disparagement and breach of the duty of good faith and fair dealing; (6) negligence; and (7) copyright infringement. The hearing officer declined to review or rely upon the previous fact findings and investigations of either the bankruptcy court or Congress. *See Report* at 313–14. In short, the hearing officer decided to base her decision solely on the evidence presented to her.[3] *See id.* at 314.

On March 29, 1996, the hearing officer, in addressing defendant's second motion *in limine* or for partial summary judgment, held that: (1) the unmodified contract "fully empowered the Government to use INSLAW's computer software and other technical data in whatever manner it deemed proper, including ... dissemination of these materials beyond the EOUSA and the [USAOs]," *INSLAW, Inc. v. United States,* 35 Fed.Cl. 295, 305 (1996);[4] (2) modification 12 was "sufficiently ambiguous so as to allow INSLAW to introduce extra-contractual evidence to argue that Modification 12 applies to the PRIME version [of PROMIS]," [5] *id.;* and (3) INSLAW's failure to appeal the decision of the CO regarding proprietary rights to enhancements barred it from asserting any legal claims in the reference, *see id.* at 307.

In an effort to address the issue of dissemination of PROMIS outside of DOJ,[6] the hearing officer and the parties established a

protocol whereby a panel of three experts, chosen by the parties, reviewed similar software in use at six non-DOJ agencies to determine whether that software was derived from PROMIS.[7] *See Report* at 320–26. The expert panel reported on December 18, 1996, that there was no evidence that the software analyzed was copied or derived from PROMIS. *See id.* at 326.

Trial was held March 10–28, 1997, in Washington, D.C. The hearing officer issued her final report on July 31, 1997.[8] The report concluded:

> Plaintiffs failed to prove that INSLAW's claimed enhancements were proprietary; that DOJ acted unjustifiably in respect of them; that the Government had less than unlimited rights in enhanced PROMIS as delivered and installed; that DOJ in any way frustrated or impeded proof of IN-SLAW's proprietary rights to the claimed enhancements; or that DOJ administered the 1982 Contract in bad faith. Plaintiffs have shown no basis for recovery in law or equity. Any recovery would be a gratuity.

*Report,* at 410.

On November 14, 1997, plaintiffs, as provided in RCFC appendix D, paragraph nine, raised the following exceptions:

> 1) [The hearing officer e]rred in granting Defendant's [prehearing] motion *in limine* and for partial summary judgment, restricting ... the introduction of relevant evidence, and limiting Plaintiffs to a re-

---

3. We agree with her approach. The hearing officer noted that the fact findings from the congressional investigation did not arise from proceedings conducted under the Federal Rules of Evidence. *See Report* at 314. The opinion and fact findings of the bankruptcy court were vacated by the District of Columbia Circuit. *See id.*

4. The hearing officer also held that INSLAW did not reserve any limited or restricted rights as provided under the contract.

5. The terms "PRIME," "VAX," and "DEC PDP 11/70" are used in this opinion to refer to particular types of computers used to run the PROMIS software. A glossary of terms is attached.

6. Plaintiffs contended that the demand for software that led to modification 12 was a ruse to "get" the software and disseminate it throughout the government. Part of their damage claim was

based on licensing fees related to widespread dissemination, violating of their right to distribute and exceeding the scope of the government's license, to agencies outside DOJ.

7. The six agencies were determined based on affidavits filed on behalf of plaintiffs attesting to a reasonable belief that the agencies were using software derived from PROMIS. The six agencies involved were the U.S. Customs Service, the Federal Bureau of Investigation, the Drug Enforcement Agency, the National Security Agency, the Defense Intelligence Agency, and the Central Intelligence Agency. *See Report* at 326.

8. This panel commends the hearing officer on her *comprehensive report.* We recognize that the issues and facts here are complex. The report and the hearing officer's shepherding of the case demonstrate that plaintiffs' claims were heard and addressed fairly and promptly.

stricted form of equitable relief only, contrary to the terms of this Congressional Reference;

2) [The hearing officer e]rred in concluding that INSLAW had no proprietary, copyright or other ownership interest in PROMIS, that PROMIS was in the public domain, and that the government acquired an unrestricted copyright license encompassing all of INSLAW's copyright[s];

3) [The hearing officer e]rred in concluding that the three major enhancements— INSLAW's VAX 11/780 version of PROMIS, and the stand-alone data base adjustment and batch update systems—were deliverables under the 1982 Contract prior to MOD 12;

4) [The hearing officer e]rred in concluding that Defendant did not breach its duties under [MOD 12] and the duties of good faith and fair dealing inherent therein, with respect to INSLAW's efforts to resolve the issue of its proprietary rights to, and private funding of, claimed enhancements;

5) [The hearing officer e]rred in failing to read MOD 12 with the 1982 Contract as an integrated whole, resulting in the conclusion that MOD 12 vitiated more specific provisions;

6) [The hearing officer e]rred in concluding that INSLAW did not present satisfactory evidence that the enhancements to and in the software delivered pursuant to MOD 12 were privately funded, and in excluding certain evidence with respect thereto;

7) [The hearing officer e]rred in finding Plaintiffs' proof of licensing fees deficient because of what the Officer deemed the "Delayed Production" of the comparable product DOCKETRAC; and

8) Such other specific exceptions as may appear hereinafter and as specifically called to the attention of this Court, either in the Statement of the Case or the Argument thereof.

(Pl.'s Br. with Exceptions to Hr'g Officer's Report at 1–2 (paragraph structure added).) Oral argument before the review panel was held on February 25, 1998, in Washington, D.C. Unless otherwise noted in this report, this review panel adopts the findings of fact and conclusions of law of the hearing officer, and a familiarity with her report of July 31, 1997, is assumed.

## DISCUSSION

### I. Standard of Review

 The congressional reference represents a unique aspect of the jurisdiction of the Court of Federal Claims. The court's jurisdiction and procedure in these cases are governed by 28 U.S.C. §§ 1492, 2509 (1994). The matter is heard in the first instance by a judge of this court who sits as a hearing officer. After the hearing officer's decision, the parties bring any exceptions to a review panel consisting of three other judges of this court. The review panel is authorized by statute to review the findings and conclusions of the hearing officer and the record in the case. See 28 U.S.C. § 2509(d). Contrary to plaintiffs' position at oral argument and in their briefs, the panel does not review fact findings of the hearing officer *de novo*. The hearing officer's findings may not be set aside "unless clearly erroneous, and due regard shall be given to the opportunity of the hearing officer to judge the credibility of witnesses." *See* RCFC app. D, ¶ 8; *cf.* Fed.R.Civ.P. 52(a) (containing similar language and setting clear-error standard). A finding is clearly erroneous when although there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (discussing Fed.R.Civ.P. 52(a)); *see also Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 622, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993) (quoting *U.S. Gypsum*). The review panel will apply the "clearly erroneous" standard of Federal Rule 52(a) to all facts, regardless of whether they are "subsidiary" factual findings or "ultimate" factual findings. *See Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). The standard is not applied to conclusions of law. *See id.* On the basis of the entire record, "the panel, by majority vote, shall

adopt or modify the findings or the conclusions of the hearing officer and shall file its report with the clerk, for service on the parties." *See* RCFC app. D, ¶ 10.

## II. The Basic Dispute

This dispute arises from a fundamental misunderstanding over the effect of contract modification 12. Plaintiffs essentially allege that DOJ breached its obligations under contract modification 12 and that DOJ used it to misappropriate INSLAW's rights in proprietary enhancements to the PROMIS software. These allegations have a common theme: Did the government have any property rights in the software obtained via contract modification 12? The defendant asserts that DOJ acquired unlimited rights in the enhanced software because: (1) INSLAW acted as a volunteer in providing the enhanced software to satisfy the contract deliverable; (2) INSLAW proposed in its technical proposal to use the VAX computer to conduct timesharing, making it a deliverable under the contract; and (3) the government obtained unlimited rights in that software under clause 74(b)(1)(ii).

### A. *The Software*

Before looking at the effect of modification 12, it is important to briefly summarize the different software at issue and its role in this dispute. First, the contract obligated INSLAW to install the pilot version of PROMIS plus the Bureau of Justice Statistics (BJS) enhancements. This pilot version, as it is referred to throughout the litigation, was developed using government funding on a previous contract between INSLAW and DOJ. The contract at issue here also required INSLAW to provide PROMIS on a timesharing basis for certain USAOs.[9] The contract contemplated that the timesharing version of PROMIS would possess the same capabilities as the pilot version; in other words, it was supposed to be the same pilot software, run on INSLAW's computers for

DOJ instead of on DOJ's computers. This software was necessary to fulfill INSLAW's obligation under the contract.

INSLAW decided to use the PROMIS software on a VAX computer platform to perform the timesharing. According to plaintiffs, timesharing could not be supported by the original computer platform, DEC PDP 11/70. At some point during the contract, INSLAW began enhancing the PROMIS software. These enhancements were added to a master copy of PROMIS on INSLAW's VAX computer. This same "master copy" was used to support timesharing of PROMIS for the contract. It is this software that is referred to as the VAX timesharing version or the enhanced VAX timesharing version.

Because of INSLAW's perceived financial difficulties, the CO exercised his right under article XXX of the contract to demand a copy of the software in the government's use at the time. At that time, the government had yet to decide which computers were to be installed, thus the only software in use at the time was the VAX timesharing version.[10] As mentioned, this version was also the version INSLAW used to develop newer versions of PROMIS. At the time, no other versions of PROMIS were in use under the contract, or, for that matter, on any other project. The demand was followed by negotiations that produced bilateral contract modification 12. This modification imposed obligations on both INSLAW and the government.

At some point after the modification took effect, INSLAW installed and tailored the enhanced VAX timesharing version of PROMIS at the designated USAOs to satisfy its obligations under the contract. The installations of the enhanced version are the focus of plaintiffs' claims here. Plaintiffs claim that the demand for software and the resulting modification forced INSLAW to install an enhanced version that was outside the scope of the contract. They also assert that DOJ's use of that software exceeded its

---

9. This timesharing arrangement was intended to provide the software capability for selected USAOs, pending the government's decision on the type of computers on which PROMIS would be installed and the purchase of those computers.

10. There were two USAOs that were running the pilot version of PROMIS installed under a previous development contract. These versions were not at issue here.

rights under the contract and under modification 12.

### B. *Was INSLAW Forced to Install the Enhanced Software?*

■ Plaintiffs misread modification 12. This misunderstanding arises from the dichotomy between INSLAW's original obligation only to install an unenhanced version of PROMIS and its separate obligation under article XXX and modification 12 to turn over one copy of the VAX timesharing version it had elected to use at the time.

The modification did not address what was to be installed under the original contract because it imposed a different obligation. The contract obligated INSLAW to install the pilot version of PROMIS with BJS enhancements on government-furnished computers.[11] This obligation was never altered by modification 12. Modification 12, by its terms, did not address installation of any software. Furthermore, the modification specifically stated: "Neither the Government nor the Contractor intend by means of this Supplemental Agreement to change or affect in any way the terms and conditions of the said Contract...." Modification 12 only obligated INSLAW, pursuant to the CO's authority under article XXX, to turn over one copy of whatever data, software, and reports it was using on April 11, 1983, to the CO.[12] It is apparent that the modification does not contemplate installation: "To the greatest extent possible this information shall be provided on magnetic tape using standard VAX utilities to create the tape file from the corresponding disk files." There would be no need to refer to "magnetic tape" or other storage media if installation were contemplated by the modification. The contractually required software would be installed by INSLAW directly on the government's computers. Modification 12 merely recognized that the parties had a dispute over the impli-

cations of the government's exercise of its rights under article XXX.

Furthermore, modification 12 could not alter INSLAW's data rights in proprietary enhancements, only INSLAW's actions could. The action of providing one copy of the VAX timesharing version, including alleged enhancements did not affect the data rights of either party. The government's data rights in INSLAW's software were governed by clause 74 of the contract.[13]

Modification 12, however, was based on the CO's article XXX power, not on clause 74. At the CO's request, INSLAW would be obligated under article XXX to provide copies of the software in use at the time, subject to an equitable adjustment if necessary. Article XXX had nothing to do with the installation of PROMIS at the various USAOs. INSLAW always remained obligated to install only the pilot version of PROMIS at various USAOs per the contract. As the hearing officer noted, even INSLAW took this position with the government: "INSLAW's General Counsel, Mr. Kelley, sent DOJ the April 20, 1982 letter stating that deliverables under the contract would not be affected by INSLAW's proprietary enhancements. This letter assured DOJ that INSLAW would deliver a version of software consistent with the 1982 Contract." *Report* at 387. Thus modification 12 itself did not require INSLAW to install the VAX timesharing version of PROMIS to satisfy the contract installation deliverable. It was not coercive.

The circumstances surrounding the CO's demand for the PROMIS software were also not coercive. First, there was no indication from the correspondence leading to and following the drafting of modification 12 that DOJ ever demanded that an enhanced version was to be installed to satisfy the contract obligations. The CO merely exercised

---

11. The installation would necessarily require tailoring to adopt the software to the new computer platform chosen by the government.

12. Article XXX gives the CO the authority to request copies of certain data and reports when he deems it necessary. Modification 12 was based on this authority.

13. The circumstances that would lead to the vesting of unlimited rights in the government are set out in clause 74. Clause 74 gave the government unlimited rights in "computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract...." *See* discussion *infra* part III.B.

his authority under article XXX to request a copy. In his letter of March 18, 1983, the CO stated:

> That contract requires that INSLAW furnish to the Government a functional version of PROMIS for its unlimited use. Before the Government can commit itself to accepting a version of PROMIS excluding "proprietary enhancements" already in use under the contract by several United States Attorney's Offices, it must know what those enhancements consist of.

Plaintiffs argue that this language constitutes a demand for installation of the enhanced PROMIS software to satisfy the contract. It is clear, however, that this language, which is repeatedly quoted by the CO in subsequent correspondence, contemplates the original contract deliverable, the pilot PROMIS plus the BJS enhancements.[14] The reference to "a version of PROMIS excluding 'proprietary enhancements'" is not a demand to install enhanced software, but rather a demand to explain what the government was getting and what the basis was for INSLAW's claim that proprietary enhancements were imbedded in the software. The hearing officer recognized that DOJ was concerned over the ability of INSLAW to deliver contractually required software. The CO's concerns were reasonable. This letter and the rest of the correspondence, which cites this language, cannot be construed as a demand for installation of the enhanced version of PROMIS.

There is no basis for finding that the article XXX demand was issued in bad faith.[15] While the hearing officer recognized that there were difficulties between Mr. Brewer and Mr. Hamilton, she found that DOJ's actions were not affected by those difficulties. *See Report* at 370–71. DOJ had a valid basis for demanding a copy of the existing software; it was concerned about the financial stability of INSLAW and did not want to be left without any product if INSLAW went under. *See Report* at 382–83.

## C. *INSLAW Acted as a Volunteer*

■ If neither modification 12 nor DOJ's actions forced INSLAW to install the "enhanced" version of PROMIS, what effect does the installation have on the government's rights here? The short answer is, none. INSLAW acted as a volunteer. The import of this point is that, if the government had coerced INSLAW into installing the enhanced version of PROMIS, the government would not have had unlimited rights because that installation would have been outside the scope of the contract and not a "necessary part of fulfilling" the contract. INSLAW, however, voluntarily installed the enhanced version, and that installation was thus not an extracontractual requirement. *Cf. John Thomson Press and Mfg. Co. v. United States,* 57 Ct.Cl. 200, 216–17 (1922); *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 526, 455 F.2d 1037 (1972).

As previously mentioned, the contract obligated INSLAW to furnish and install the pilot version of PROMIS plus the BJS enhancements.[16] *Report* at 335. If INSLAW had performed its obligations as written in the contract, the government would have had unlimited rights under clause 74(b)(1)(ii) in the pilot version of PROMIS plus the BJS enhancements. The contract provided, in clause 74(b), that the government would have unlimited rights, which are tantamount to a nonexclusive, royalty-free license, in "computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract." *See* Contract Clause 74(b)(1)(ii). The pilot version of PROMIS and the BJS enhancements were developed under government funding in previous contracts.

To satisfy its performance obligation under the contract, however, INSLAW furnished and installed a version that contained allegedly proprietary enhancements based on the VAX timesharing version of PROMIS. By

---

**14.** If the enhancements alleged by INSLAW were proprietary, then the phrase "a functional version of PROMIS for [the government's] unlimited use" can only mean the pilot version of PROMIS and any other enhancements that were government funded. This phrase invokes the criteria set out in clause 74.

**15.** *See* discussion *infra* part III.D.2.

**16.** The BJS enhancements were previously funded under a contract between INSLAW and DOJ's Bureau of Justice Statistics.

doing so, INSLAW effectively made the VAX timesharing version of PROMIS, with enhancements, a "necessary part of performing" under this contract. In other words, when INSLAW elected to use the enhanced version to satisfy a contract deliverable, the government was vested with unlimited rights in that version.

Plaintiffs argue that the mere fact that it had a proprietary interest in the enhancements should prevent the government from infringing on its rights in those enhancements. To allow the plaintiffs, however, to prevent the government from using what was installed under the contract by asserting its proprietary rights would deprive the government of the benefit of its bargain with INSLAW. The government bargained for the installation of PROMIS. Part of that bargain was the vesting of unlimited rights, as defined in clause 74, in the installed software. By electing for its own convenience to install the enhanced version instead of the pilot version, INSLAW satisfied its obligation. But plaintiffs cannot choose to install more than was required under the contract and then seek to limit the government's rights or force payment for the extra work. INSLAW's voluntary installation of the enhanced software entitled the government to unlimited rights in that software. While INSLAW retained its property rights in PROMIS, the government obtained an unrestricted right to use the enhanced software under clause 74.

Even if INSLAW had not volunteered to install the enhanced version, the panel also adopts the hearing officer's findings as to three crucial points. First, plaintiffs did not prove any enhancements beyond the twelve that Dr. Davis, defendant's expert, identified. *See Report* at 359. Second, plaintiffs failed to prove any causal link between private funding and any of those enhancements. *See id.* at 341–59. Third, plaintiffs could not prove that they suffered damage as a result of any unauthorized copying or use of proprietary enhancements. *See id.* at 409–10. Nothing in the plaintiffs' briefing demon-

strates clear error by the hearing officer in these critical respects.

Some specific exceptions merit further attention, however, and are addressed below. The parties can assume that the panel has considered and rejected or found irrelevant any other exceptions that were raised.

### III. Plaintiffs' Exceptions to the Hearing Officer's Report

#### A. *Is INSLAW Precluded from Seeking Legal Relief?*

■ Plaintiffs' complaint asserts the following theories: taking without just compensation; violation of due process; common-law fraud, misrepresentation, suppression, and deceit; conversion; disparagement and breach of the duty of good faith and fair dealing; negligence; and copyright infringement. The hearing officer found that these claims were barred by application of the statute of limitations because they were the subject of an unappealed final decision of the CO on a claim under the Contract Disputes Act.[17] Plaintiffs challenge the hearing officer's conclusion. They argue that the CO's final decision, cited by the hearing officer in support of her conclusion, did not address the question of INSLAW's rights in the PROMIS software. Plaintiffs contend that, because the final decision was silent on the issue of data rights, it could not have addressed the issue.

Plaintiffs filed a claim with the CO on October 17, 1985, seeking additional compensation for privately funded enhancements that were "taken" by the government. In its claim, plaintiffs outlined the course of negotiations regarding the privately funded, allegedly proprietary enhancements.

The Supplemental Agreement [Modification 12] explicitly contemplated a decision by the Government on the proprietary enhancements, and implicitly contemplated a timely decision. During the two-and-a-half years that have transpired since the execution of the Supplemental Agreement, the Government has enjoyed the full use of the

---

17. In her preliminary ruling, the hearing officer held that "INSLAW's claims of conversion, deprivation, dissemination, and other tortious acts, with regard to the contractual data rights issue, could have been brought to the contracting officer." *INSLAW*, 35 Fed.Cl. at 306.

proprietary enhancements without paying any licensing or use fees, the Government has made no attempt to resolve the issue as promised in the Supplemental Agreement, and the Government has apparently further injured the rights of INSLAW by manufacturing additional copies of the proprietary enhancements. INSLAW hereby requests a Final Decision.

(Def.'s App. of 12/16/97, ex. 5, at 15.) The CO issued a final decision on February 21, 1986, denying the claim for licensing fees in its entirety. Because INSLAW did not appeal the issue to either the appropriate contracts appeal board or the Court of Federal Claims within the statute of limitations, plaintiffs were precluded from legal relief. *See INSLAW,* 35 Fed.Cl. at 306–07.

Plaintiffs contend that the CO's final decision could not be used to calculate the limitations period because it did not determine the data-rights issue. It is apparent from the face of the claim, however, that the claim for licensing fees necessarily implicates the issue of data rights; the licensing fees are the measure of damages for violation of plaintiffs' data rights. The mere fact that the CO could have been more detailed in supporting his decision to deny the licensing fees does not mean that the issue of data rights remained open.[18] The entitlement to licensing fees arose from plaintiffs' alleged proprietary rights in the enhancements. By denying the licensing fees, the CO essentially denied any proprietary claim INSLAW had to those enhancements against the government. Thus the hearing officer's conclusion that plaintiffs were precluded from seeking legal relief was correct.

18. Furthermore, INSLAW's claim states that "the Government has made no attempt to resolve the issue [of data rights] as promised in the Supplemental Agreement...." Even if the CO's silence as to the data rights left the issue open, the silence would become a deemed denial within 60 days of the filing of the claim. *See* 41 U.S.C. § 605(c)(1), (5) (1994). As INSLAW never brought a suit in either the contracts appeal board or the Court of Federal Claims on this claim, it is no longer entitled to legal relief.

19. This seems inconsistent with the hearing officer's report. *See Report* at 332–33 n. 17. While we do not agree with the hearing officer's characterization, her statement was understandable.

**B. *INSLAW's Rights in the Various Versions of PROMIS Software***

Plaintiffs challenge the hearing officer's characterization of INSLAW's copyrights. They allege that, in determining the rights of the government in the PROMIS software, she ignored their copyrights. They also contend that the hearing officer erred by describing the government's unlimited rights under the contract as being the equivalent to committing the software to the public domain. Defendant argues that the hearing officer properly determined INSLAW's rights based on clause 74 of the contract, which addresses the rights of the government in INSLAW's software and copyrights. Defendant also counters that the hearing officer did not make a finding that INSLAW's software was in the public domain[19] and that plaintiffs have not proven ownership of any copyrights in any works created under the contract.

Whether only the *pilot* version of PROMIS—developed under a prior contract with DOJ—was committed to the public domain[20] is immaterial. *See Report* at 332–33 n. 17. Both parties agree that INSLAW may own copyrights in software prepared under the contract. (*See* Def.'s Br. of 12/16/97, at 21; Pl.'s Br. of 1/6/98, at 13–14.) What they do not agree on is the nature of the government's contractual rights in the PROMIS software.

The government's rights in the PROMIS software are governed by the contract:

[The contract] conferred upon the Government Unlimited Rights in computer software and other technical data. Further-

*See infra* note 18. It is also immaterial, as explained below.

20. Plaintiffs challenge that finding, despite the admission of its own representatives that the pilot version was committed to the public domain. The review panel notes that the status of the pilot version of PROMIS with respect to the public domain is not relevant to the resolution of this matter. The modified pilot version, including the previously funded enhancements, was a deliverable under this contract, and DOJ's rights thus arise out of the contract and not because the software was in the public domain.

more, the "N/A" notations, on the two Clause 74 sections dealing with limitations in the Government's rights indicate that these contract provisions were inoperative and did not limit the Government's rights. INSLAW may attempt to show that the "N/A" notations had some other purpose or use, but such an effort very likely will prove fruitless. Consequently, the contract itself, without consideration of Modification 12, fully empowered the Government to use INSLAW's computer software and other technical data in whatever manner it deemed proper, including, but not limited to, dissemination of these materials beyond the EOUSA and the United States Attorney's Offices.

*INSLAW*, 35 Fed.Cl. at 305. In her final report, the hearing officer concluded that "the evidence was wholly one-sided that 'N/A' had no other significance than non-applicable." *Report* at 327. Thus the government possessed unlimited rights in all software under the contract; none were subject to either restricted or limited rights.[21]

The plaintiffs argue, however, that the government's unlimited rights should be read under clause 74(c) in light of INSLAW's copyrights.[22] They do not challenge the fact that the government has a nonexclusive license in certain software; they contend that the government exceeded that license. Plaintiffs are correct that clause 74 should be read in its entirety. Clause 74(b)(1) "places no limits whatsoever on the Government's rights to obtain, use, or disseminate these materials." *INSLAW*, 35 Fed.Cl. at 304. The contract defines unlimited rights as "rights to use, duplicate, or disclose technical data or computer software in whole or in part, in any manner and for any purpose, and to have or permit other[s] to do so." The contract grants a license for any copyrights

held by the contractor covering unlimited-rights software:

> [T]he Contractor ... does hereby grant to the Government a royalty-free, nonexclusive and irrevocable license throughout the world for Government purposes *to publish, translate, reproduce, deliver, perform, dispose of, and to authorize others so to do,* all technical data ... and unlimited rights computer software prepared or required to be delivered under the contract, now or hereafter covered by copyright.

(Def.'s Ex. 16, vol. I, at 296 (contract clause 74(c)(1)).) This clause indicates that the government's license is broad and covers all the uses permitted under the contract for unlimited rights. This clause "fully empowered the Government to use [PROMIS] ... in whatever manner it deemed proper." *INSLAW*, 35 Fed.Cl. at 305.

Plaintiffs argue, however, that the nonexclusive license does not cover the right to prepare derivative works based on the copyrighted work. *See* 17 U.S.C. § 106(2) (1994). They cite *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir.1989), for the proposition that copyright licenses should be construed in favor of the copyright owner and that any right not expressly granted is retained by the owner. But was the right to prepare derivative works granted under clause 74(c)? A copyright license, like any license or agreement, is governed by its terms. Under the terms of the royalty-free, nonexclusive and irrevocable license granted to the government, permission was given "to publish, translate, reproduce, deliver, perform, [and] dispose of [the copyrighted works], and to authorize others so to do." Plaintiffs are correct that the clause specifically names each of the section 106 exclusive rights, except the right to prepare derivative works. The clause, however, also authorizes two actions that are not named in section 106: the

---

21. Even if the clauses were not marked "N/A," the clauses are not self-executing. The clauses are meant to be invoked by inclusion of the respective legend with the data being provided. *See* Clause 74(b)(2) & (3). Both clauses provide that either limited or restricted rights apply only to either data agreed upon by both parties as "limited" or "restricted" or data provided with the corresponding legend containing key information. Thus, even if the clauses were not

marked, INSLAW would still be under a burden to show that the data was provided with the correct legend to reserve its rights.

22. Other than explaining the concept of public domain, *see Report* at 332–33 n. 17, the hearing officer did not address specifically the effect of INSLAW's copyrights or clause 74(c) in determining the government's rights in the software.

right to translate and the right to dispose of the works. A translation is a type of derivative work. *See* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.09 (June 1997). Such specificity implies that other types of derivative works are excluded from the license. The term "dispose of," given its plain meaning, does not implicate a right to prepare derivative works. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 654 (1976). Thus the license did not grant the government the right to prepare derivative works beyond translation of the PROMIS software.

This holding is of no consequence, however, because plaintiffs have not proven any unauthorized derivative works by the government of proprietary software. There is no indication that the government prepared any other software based on PROMIS. *See Report* at 320–26.

## C. *Major Enhancements: Contract Deliverables?*

Plaintiffs challenge the hearing officer's conclusion that the three major, stand-alone enhancements—port-to-VAX, database adjustment, and batch update—were deliverables under the contract prior to implementation of modification 12.

### 1. Port–to–VAX

■ Plaintiffs contend that the version of PROMIS demanded by DOJ included a port-to-VAX enhancement [23] that was not required under the contract and that was "created" before the inception of the contract. They argue that the hearing officer erred by finding that the VAX timesharing and the VAX development versions of PROMIS were deliverables under the contract.[24]

The contract required the contractor to provide the pilot version of PROMIS with DOJ-funded BJS enhancements.[25] Plaintiffs

23. Porting is defined in the hearing officer's report as "moving the software from one hardware platform to another." *See Report* at 336 n. 20.

24. The VAX timesharing version of PROMIS was used by INSLAW to satisfy the requirement of support for ten USAOs through a dial-in system run on INSLAW's computers. The VAX development version was "used for the development of

assert that the requirement that INSLAW provide the VAX timesharing version of PROMIS was extracontractual because the contract never required a 32–bit version of PROMIS, but only the 16–bit pilot version. The hearing officer, however, found otherwise:

[Up until the port-to-VAX] the master version of PROMIS ran on the 16–bit PDP 11/70. After the port, the 32–bit VAX version became the "master copy" and was used for research and development, maintenance, and timesharing services for the USAOs under the 1982 Contract. Ms. Holton also testified that all of INSLAW's software application systems are developed "using the same software. We maintain one version and develop those different database applications using that same software." *Thus, once INSLAW adopted the VAX version as its master version of PROMIS, it became the sole version. . . . Thus, to use any other version of PROMIS in implementing any contract would cause INSLAW considerable time and expense.* Because INSLAW maintained the VAX version for upkeep, corrections (or "bug fixes"), and maintenance, no other version was retained in such error-free condition. . . .

. . . INSLAW used the VAX version of PROMIS to create the version required to be installed on the government-furnished PRIME computers. INSLAW used the VAX version, not the earlier pilot version, because the differences between the PRIME computers selected by the Government and the VAX version were not as extensive. Moreover, keeping one master decreased INSLAW's maintenance costs. *When INSLAW ported the VAX to the government-furnished PRIME computers, everything that had been done on the VAX was transferred to the PRIME, whether or*

all versions of PROMIS supported by INSLAW on different computer platforms for different customers." (Pl.'s Br. of 11/14/97, at 42.)

25. The BJS enhancements were developed under funding from DOJ Bureau of Justice Statistics under a separate contract.

*not DOJ requested the additional programming.*

*Report* at 336 (footnotes omitted) (emphasis added). The development of the port-to-VAX was funded by charging to the computer center, which was supported in part by government funding. *See id.*

INSLAW chose to port to VAX, then to PRIME, to accomplish the contract objectives, instead of porting directly to PRIME when the government decided on the PRIME computers. The hearing officer found that the choice was beneficial to INSLAW:

> Ms. Holton acknowledged that INSLAW could have ported the pilot version from the PDP to the PRIME. It may not have been as efficient; INSLAW would have needed to add all bug fixes reported by DOJ, the BJS enhancements, and the docket and reporting conversion and have needed to tailor the software to each USAO.

*See id.* at 336–37 (footnotes omitted). By doing so, INSLAW left itself no choice but to provide the VAX enhancement, as well as other enhancements, to the government when installing the software using the VAX development version of PROMIS.

Plaintiffs insist that, because a VAX version was not a specified contract deliverable, it was error for the hearing officer to consider the issue based on the government's rights in the software. This argument misses the point. The hearing officer did not conclude that the port-to-VAX enhancement was a deliverable under the contract as written. Rather she concluded that, because of the manner by which INSLAW chose to perform the contract—by using one master version on the VAX to develop the software—the enhancement became a necessary part of performing the contract.[26] There is no error.

Furthermore, the government was entitled to the VAX timesharing version because the CO requested the software under article XXX of the contract:[27]

> The 1982 Contract recognized that the pilot PROMIS required modification. That is why it required all software to be based on the pilot study, and did not simply require the pilot study PROMIS be implemented on the VAX or in the USAOs specified by the contract.... However, INSLAW was required to operate in accordance with the 1982 Contract by making the pilot version of PROMIS operational within contractual parameters. *The enhancements made to the pilot version of PROMIS were work product that DOJ was entitled to under Article XXX,* which allowed the contracting officer to request, at any time during the contract performance, a copy of materials required or developed under the contract, including a copy of computer programs.

*Report* at 356 (emphasis added). *See generally Report* at 354–56.

The contract calls for INSLAW to provide a timesharing service pending the installation on government-furnished computers. *See id.* Section 3.1.1 of the contract statement of work states: "The criminal subsystem shall continue to be operated by the Contractor at his facility for these [timesharing] districts until such time as Government furnished equipment is installed and the subsystem is converted to the permanent equipment configuration."[28] Plaintiffs are correct that the mere fact that it performed that service did not make the VAX timesharing version a contract deliverable. Plaintiffs, however, overlook the fact that, by installing an enhanced version based on that VAX timesharing version, the product essentially became a deliverable because it was used to satisfy INSLAW's obligation.[29]

---

**26.** Plaintiffs contend that there existed a copy of the pilot version without the port-to-VAX enhancement at the time and that INSLAW was prepared to deliver that version. This statement is puzzling: If true, why did INSLAW not simply provide what was asked for under the contract?

**27.** Plaintiffs contend that the VAX timesharing version was not developed as part of INSLAW's performance of the contract.

**28.** Contract modification 1 incorporated the legal-process-debt-collection subsystem into section 3.1.1 of the statement of work.

**29.** Even before INSLAW chose to install the enhanced software, the port-to-VAX enhancement was a necessary step to satisfying INSLAW's obligations. The plaintiffs contended that timesharing services could not be performed using the pilot version and that INSLAW had to port-

2. Batch update & database adjustment

■ INSLAW contends that both the batch-update and database-adjustment software were proprietary items that preexisted the contract. The software was used to provide a service, plaintiffs contend, and not intended to be a deliverable under the contract. They contend that DOJ had no right to delivery of the software under article XXX.

The hearing officer found that INSLAW acted as a volunteer with respect to providing the batch-update software. The contract statement of work, section 3.2.2.7, required INSLAW to "develop procedures and software to transfer a district's active criminal, civil, and collections caseload as contained in the U.S. Attorney's Docketing and Reporting System to a district's new PROMIS system or word processing based system in the appropriate format to establish a district's initial data base." As the hearing officer explained:

> Assuming that INSLAW had proved that the batch update enhancement was proprietary to INSLAW, the contract provided for INSLAW to develop and deliver software similar to the batch update subsystem. Thus, if INSLAW chose not to create software specific to this contract, but, to save time and expense, utilized existing software that may have been superior to what was required, DOJ cannot be held liable for INSLAW's unilateral decision. In such circumstances INSLAW was acting as a volunteer.

*Report* at 358. *See also John Thomson Press and Mfg. Co.*, 57 Ct.Cl. at 216–17; *Chris Berg, Inc.*, 197 Ct.Cl. at 526, 455 F.2d 1037.

■ Regarding the database-adjustment software, the hearing officer concluded that the contract called for database adjustment as a service and that it did not require that the software be provided. *See id.* The version of the database-adjustment software alleged to be proprietary was in fact based on

an earlier government-funded version. *See id.* The database-adjustment software, however, was never delivered to the government. *See id.* Plaintiffs challenge this finding by pointing to testimony by defendant's expert that indicates that at least one module of the proprietary database-adjustment software was found in the VAX version of PROMIS. They also point to transmittal letters written by an INSLAW representative that state that the database adjustment was being delivered as a stand-alone system.

None of the evidence raised by plaintiffs squarely contradicts the hearing officer's finding that the database adjustment software was not delivered to the government. The testimony of Ms. Holton is inconclusive; she did not address either the delivery of software or corroborate that the government even possessed the software. Dr. Davis's testimony indicates that one module out of nine may be present in the VAX version provided to the government. This similarity, however, may not be relevant to the question here because the enhancement allegedly delivered was a stand-alone enhancement, not a discrete enhancement embedded within the code.[30] The best evidence that plaintiffs highlight is an INSLAW progress report dated March 15, 1985, which states: "The following software has been forwarded to COTR: ... Data Base Adjustment Software...." (Def.'s Ex. 167.) This letter does not indicate, however, which version of the database-adjustment software was provided: the two-module version or the nine-module version. Plaintiffs have not raised sufficient evidence to convince the review panel that a mistake was made by the hearing officer.

## D. *Breach of Duties under Modification 12 and Good Faith*

Plaintiffs challenge the hearing officer's conclusion that INSLAW did not suffer damages caused by unjustified governmental ac-

---

to-VAX to adequately timeshare the specified offices.

**30.** There were nine modules within the database-adjustment software, two of which were found not to be proprietary with respect to the govern-

ment. There was no evidence that the module present was a proprietary module or that the module was not satisfying a function required within the program.

tion. They differ with the hearing officer's conclusion that 48 C.F.R. § 3.101–1 is not applicable as a standard. They also contend that the hearing officer "found *every indicator of bad faith,* then stopped short of the conclusion." (Pl.'s Reply Br. of 1/6/98, at 18.) They argue that the hearing officer's failure to find bias on the part of DOJ staff involved in contract administration "cannot be squared with her findings about Brewer's and Videnick's [sic] attitudes, feelings and conduct...." (*Id.*)

### 1. The effect of 48 C.F.R. § 3.101–1

In evaluating the propriety of the hearing officer's conclusions relating to section 3.101–1, it is important to distinguish the two conclusions made by the hearing officer. First, she concluded that the section does not create a private right of action. This addressed any legal claim that could arise from the provision. Second, she concluded that it was not applicable in determining whether an unjustified governmental act was committed that damaged plaintiffs. This pertained to plaintiffs equitable claims arising out of this matter. Plaintiffs challenge the latter conclusion on the basis that both parties agreed that the standard was applicable.

Section 3.101–1 states in part:

Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. *Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct.* The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.

48 C.F.R. § 3.101–1 (1982) (emphasis added).

The hearing officer noted that the provision was relevant to the circumstances here but did not create a private right of action to

support a legal claim. "Because it is an elevated legal standard that is higher than wrongdoing or negligence, the court rejects 'the highest degree of public trust and an impeccable standard of conduct' as inapplicable in guiding [an] evaluation of the evidence pertaining to plaintiffs' equitable claims." *Report* at 361. The review panel respectfully disagrees with the hearing officer's analysis, although it agrees with the result.

 An equitable claim in a congressional reference must rest on the violation of a duty found through positive law. *See Menominee Indian Tribe v. United States,* 39 Fed.Cl. 441, 458 (1997). In evaluating a claim based on a negligent act, the hearing officer must find that the government possessed a duty to the contractor, that the government breached that duty, and that the breach caused the plaintiffs damage. *See id.* A statute or regulation can be adopted as the standard of conduct where the purpose of that regulation is to protect a class of persons including plaintiffs, to protect the particular interest invaded, to protect that interest against the kind of harm that resulted, and to protect that interest against the particular hazard from which the harm results. *See* RESTATEMENT (SECOND) OF TORTS § 286 (1965). Thus the question here is not whether the standard set out in section 3.101–1 is "too high," it is whether the section provides an appropriate means to assess the conduct of the government.

 The purpose of section 3.101–1 is to set a general standard of conduct for agency procurement practices. The class of persons protected can be construed to include the plaintiffs but encompasses the public at large.[31] The violation of the impeccable-conduct standard may, in some cases, benefit contractors at the expense of public policy, such as competition. The interest being protected is the integrity of the government procurement process, not a particular interest of the contractor.[32] The type of

---

**31.** Other than in this action, section 3.101–1 has only been addressed once as a standard of conduct by a federal court. *See Refine Constr. Co. v. United States,* 12 Cl.Ct. 56, 62–63 (1987). In that case, however, the section was used in a bid protest to determine whether rejection of a bid was appropriate. It has not been used as a

standard of care in a negligence determination or a congressional reference.

**32.** While contractors may have an interest in the integrity of the process, that interest is no differ-

harm alleged here, misuse of the contractor's data rights, is not contemplated by this section on its face. The hazard, unfair treatment of contractors, is arguably addressed by the section, but the primary purpose is clearly to protect the integrity of the system.[33] Thus the standard set in section 3.101–1 is inappropriate as a standard of care in this case. The hearing officer correctly rejected use of section 3.101–1 in considering whether the plaintiffs were damaged by an unjustified governmental act.

### 2. Bad faith

While plaintiffs do not make it clear which specific findings or conclusions they challenge, their briefing reveals two particular areas where they allege bad faith on the part of the government: (1) bad faith as a result of an overwhelming bias against INSLAW in DOJ; and (2) bad faith relating to modification 12 because the CO and Mr. Brewer had prejudged the issue of data rights, because DOJ knew that plaintiffs would never be able to prove their proprietary enhancements to DOJ's satisfaction, and because DOJ refused to cooperate with INSLAW to determine INSLAW's rights.

 Government employees are entitled to a presumption that they are acting conscientiously. *See Librach v. United States,* 147 Ct.Cl. 605, 612 (1959). "A finding of bad faith requires 'well-nigh irrefragable proof' in order for the court to abandon the presumption of good faith dealing. . . . The necessary and almost irrefutable proof has been equated with evidence of a *'specific intent to injure the plaintiff.'* " *Haney v. United States,* 230 Ct.Cl. 148, 152, 676 F.2d 584 (1982) (quoting *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954), and *Kalvar v. United States,* 211 Ct.Cl. 192, 198–99, 543 F.2d 1298 (1976)). The appropriate question, as the hearing officer stated, is whether

Mr. Brewer, in his capacity as Project Manager, committed an unjustified act—a

negligent act or other wrongdoing with the specific intent to injure plaintiffs; whether his superiors did so in hiring him and retaining him after INSLAW objected to his conduct; or whether other DOJ officials and employees were involved with administering the contract did so in respect of the 1982 Contract.

*Report* at 362.

### a. Bias

 It is apparent that there was a great deal of friction between Mr. Hamilton, INSLAW's president, and Mr. Brewer, DOJ's project manager. The hearing officer, however, concluded that such friction did not result in bias:

Mr. Brewer displayed intense negative feelings against INSLAW and Mr. Hamilton, but he was *not* biased against the 1982 Contract. No evidence supports an inference that Mr. Brewer wanted INSLAW to fail; failure of the 1982 Contract would jeopardize his career and undermine his goals. Similarly, Mr. Hamilton was extremely defensive about Mr. Brewer; he fought Mr. Brewer and his directives. He readily accepted broad conspiracy allegations. Consequently, other individuals had to unite the two fronts and make progress.

*Report* at 370–71 (footnote omitted). While plaintiffs challenge this particular finding, they do not indicate any specific evidence that would indicate that the finding is clearly erroneous. Plaintiffs rely on the hearing officer's statement that: "Mr. Brewer became difficult, distrustful, and irascible. DOJ should not have put Mr. Brewer in a position to manage his former employer's contract." *Report* at 368. However, the review panel agrees with the hearing officer that being "difficult" does not amount to bias. Plaintiffs must show more to overcome the standard of "well-nigh irrefragable proof" by showing a "specific intent to injure" INSLAW on the part of either Mr. Brewer or others. Indeed, the hearing officer "scoured the record for evidence of bias, negligence,

---

ent than that of the public at large. *See* Restatement (Second) of Torts § 288 cmt. b (1965).

**33.** There is a paucity of case law dealing with 48 C.F.R. § 3.101–1. In most cases, it is invoked

only when a government official violates the prohibition against conflicts of interest. *Cf. Refine Constr. Co. v. United States,* 12 Cl.Ct. 56, 63 (1987).

malfeasance, nonfeasance, conspiracy, and any management actions by Mr. Brewer or others that frustrated or impeded INSLAW's contract performance or interfered with INSLAW's contract rights." *Id.* We cannot ask the hearing officer to do more. There is no error.

### b. Bad-faith relating to modification 12

■ Plaintiffs rely on two facts to support a finding of bad faith relating to modification 12. First, they note that prior to entering modification 12, Mr. Brewer and other DOJ personnel expressed extreme skepticism towards the allegedly proprietary enhancements. Second, they note that DOJ refused to cooperate with INSLAW after modification 12, indicating that there was never an intent to allow plaintiffs to prove that the enhancements were proprietary.

The hearing officer's finding was not clearly erroneous. Modification 12 was a direct result of negotiations between the parties over the CO's demand for the software under article XXX. It is apparent from the modification itself that the parties contemplated a resolution of the data-rights issue before decisions were made regarding the VAX time-sharing version; the modification does not resolve that issue. There is no question that DOJ wanted to get a copy of the software as it existed at the time of the dispute. Its reasons, despite plaintiffs' contentions, were legitimate. The DOJ was genuinely concerned over INSLAW's financial viability. The fact that DOJ wanted the software under article XXX, however, is not evidence of bad faith in negotiating modification 12.

The DOJ personnel may well have been skeptical of INSLAW's claims, but the hearing officer declined to find that the skepticism rose to the level of bad faith. The evidence in the record fully supports the hearing officer's finding that "DOJ was entertaining a dialogue with INSLAW and was providing feedback." *Report* at 397. (*See* Pl.'s exs. 76, 80, 95, 99.) The DOJ's skepticism was reasonable in light of the inadequate proof offered by INSLAW to substan-

tiate its claims. Plaintiffs assert that it was DOJ's responsibility to discuss what methodologies were acceptable to prove the proprietary enhancements and that it was improper for DOJ to merely reject INSLAW's proof. Once the plaintiffs claimed proprietary enhancements, however, the burden to prove that they were indeed proprietary fell on plaintiffs. It is apparent from the record what DOJ wanted from INSLAW: identification of enhancements and proof of their proprietary nature based on a sound methodology. There is no evidence that supports the plaintiffs' exception to the hearing officer's finding:

> The court finds that Modification 12 contemplated that INSLAW's data rights claims be resolved by INSLAW's submitting proof of its enhancements in a manner consistent with Mr. Videnieks' March 18, 1983 letter; that INSLAW failed to do so within a reasonable time; that DOJ did not impede, frustrate, or refuse to respond unjustifiably or in bad faith to INSLAW's effort to resolve its claims; that DOJ officials did not preclude INSLAW from proving the existence and ownership of any enhancements in the software delivered pursuant to Modification 12....

*Report* at 400. There is no error.

### E. Interpretation of Modification 12

■ Plaintiffs challenge the hearing officer's interpretation of modification 12 to allow DOJ to disseminate the PROMIS computer software to any of the ninety-four USAOs under the contract. They argue that, because of the two-prong nature of the contract deliverables—installation on computers and word processors—the modification contained an inherent further limitation on the dissemination of the computer version: it could only be copied to the twenty to thirty USAOs originally slated to receive the computer version.[34] Plaintiffs argue that, when the word-processor portion of the contract was terminated, the USAOs that were slated to receive the word-processor version "dropped out" of the contract and modification 12. Because the limitation

---

34. Under the contract, the computer version was to be installed in twenty USAOs and the word-processor version was to be installed in sixty-nine offices. The contract provided leeway for the computer version to be placed in up to ten more USAOs.

in modification 12 addresses only data rights and not obligations to install, the panel agrees with the hearing officer that DOJ was free to disseminate PROMIS to any of the eighty-nine named USAOs.

Modification 12 provided the following limitation on DOJ:

The government shall limit and restrict the dissemination of the said PROMIS computer software to the Executive Office of the United States Attorneys, and to the 94 United States Attorneys' Offices covered by the Contract, and, under no circumstances shall the Government permit dissemination of such software beyond these designated offices, pending resolution of the issues extant between the Contractor and the Government under the terms and conditions of [the Contract]....

(Def.'s Ex. 16, vol. I.) The hearing officer concluded that the modification should be accorded its plain meaning: "[T]he modification is applicable to 94 USAOs and allows the Government to distribute the PROMIS computer software to any of those offices. The fact that INSLAW no longer was required to deliver word-processing software to certain offices is wholly irrelevant in interpreting the plain language of the modification." *Report* at 377.

Plaintiffs are correct that the 1982 Contract must be read as an integrated whole, including all modifications and provisions. In challenging the hearing officer's conclusion, however, plaintiffs misconstrue the effect of the modification. Modification 12 is directed to INSLAW's data rights in allegedly proprietary enhancements. It preserves the *status quo ante* and limits the government's ability to exercise its unlimited rights temporarily. As mentioned above, it does not contemplate installation of software.

Plaintiffs were obligated under the contract to install the PROMIS software; the "dichotomy" of computer versus word processor existed only with respect to this installation work of INSLAW. For example, plaintiffs point to section 3.2.7 of the contract statement of work, which provides:

The government may modify the exact numbers of PROMIS based systems and word processing based systems to be installed. Such modifications will be made following selection of word processing and computer equipment. The number of computer based systems to be installed may increase from twenty (20) to as many as thirty (30)....

This provision addresses the obligation of INSLAW to install the software. It does not address the issue of the right to use the software, which is outlined in clause 74.

If INSLAW had performed the contract without incident, the government would have had unlimited rights in the pilot software under contract clause 74. Modification 12 thus preserved the status quo pending the resolution of the issue of whether INSLAW had any proprietary rights in enhancements contained in the PROMIS software. When modification 12 was executed, it temporarily limited the government's unlimited rights to copy and distribute the program to the ninety-four USAOs and the Executive Office of the U.S. Attorneys. This limitation was directed at the government's unlimited right to use under clause 74 and thus coexisted with INSLAW's independent obligations pertaining to the installation of the software. The mere fact that the obligation to develop and install a word-processor version in certain offices was terminated did not affect the government's right to use pursuant to clause 74. In other words, once the word-processor portion of the contract was terminated, INSLAW was no longer obligated to develop and install a word-processor version. However, the government could copy the computer program for any government use.

Thus the termination of the word-processor portion of the contract is irrelevant to the question of whether DOJ breached modification 12; the termination addressed the development and installation of a word-processor version, the modification was only addressed to data rights in the software. There is no error.[35]

---

**35.** The panel notes that, even if the government violated modification 12 by disseminating PROMIS outside of the modification's scope, any recovery would be minimal because the modification was temporary and resolution of the data- rights issue, as mentioned above, is in the government's favor. INSLAW cannot complain about dissemination of software it voluntarily installed to satisfy its contractual obligations.

## CONCLUSION

After careful consideration of plaintiffs' exceptions, the hearing officer's report, and the record in this case, the review panel is satisfied that the hearing officer did not err in determining that any award to the plaintiffs would be a gratuity. The panel unanimously adopts the report of the hearing officer, subject to the minor modifications noted herein. This report shall be forwarded to the Chief Judge pursuant to 28 U.S.C. § 2509.

## GLOSSARY

BJS DOJ Bureau of Justice Statistics

CO Contracting officer

COTR Contracting officer's technical representative

DEC Digital Equipment Corporation

DOJ Department of Justice

DOTCAB Department of Transportation Contract Appeals Board

EOUSA Executive Office of the United States Attorneys

INSLAW Plaintiff; for-profit corporation formed in 1981; shorthand for all named plaintiffs in Report

PDP Type of computer (16–bit) made by Digital Equipment Corporation and initially used by INSLAW to develop the pilot version of PROMIS.

Port Action of transferring a program from one computer to another computer.

PRIME Type of computer (32–bit) purchased by DOJ for implementation of the 1982 contract.

PROMIS Prosecutor's Management Information System.

USAO United States Attorney's Office

VAX Type of computer (32–bit) made by Digital Equipment Corporation and used by INSLAW to develop PROMIS.